U. S. INDUSTRIAL CHEMICAL COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (James Bailey, Appellee).

Fourth District (Industrial Commission Division)   No. 4—85—0456WC

Opinion filed May 13, 1986.—Rehearing denied June 25, 1986.

WEBBER, P.J., specially concurring.

Stephen L. Corn and Rochelle A. Funderburg, both of Craig & Craig, of Mattoon, for appellant.

Stephen M. Cornelius, of Scheele, Cornelius & Associates, Ltd., of La-Grange, for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, James Bailey, filed an application for adjustment of claim under the Worker's Occupational Diseases Act (Ill. Rev. Stat. 1977, ch. 48, par. 172.36 *et seq.*) for an occupational disease sustained

while employed by respondent, U.S. Industrial Chemical Company. An arbitrator found that petitioner was suffering from an occupational disease which left him permanently disabled and which arose out of and in the course of his employment. The arbitrator awarded petitioner $212.27 per week for life. The Industrial Commission affirmed the arbitrator's decision, and the circuit court of Coles County confirmed the decision of the Commission. Respondent appeals.

Petitioner was employed by respondent, a manufacturer of industrial chemicals, from February 1958 to November 22, 1977. During this period, he worked in several different departments involving various duties. Petitioner testified that beginning in 1958 he shoveled a substance the supervisor told him was sodium silica fluoride, which covered him with fine powder and dust; unloaded sulfur without a mask; shot acid pellets into large tanks, wearing a rubber suit but no mask; and shoveled phosphoric acid and sulfuric acid sludge from the bottom of railroad tank cars, wearing an unsealed hood and rubber suit. He ran samples of products through the laboratory by draining acid into bottles, thus inhaling fumes from the acids; operated a unit causing him to inhale odors from the by-product sodium silica fluoride; fed chemicals into the synthesis end of an operation, coming into contact with ethyl chloride and chlorine in the form of liquid and gas; and packaged, mixed and pumped ethylene gas into cylinders. Petitioner loaded tank cars, exposing him to fumes from acetone, methanol, vinyl chlorides, butanol, butyl acetate, ammonia and chlorine; and used a pump nozzle daily to load drums with various chemicals including butyl acetate, denatured alcohol, butyl alcohol, ethyl acetate, methanol, ethyl ether and vinyl acetate. He bottled solvents in gallon cans; cleaned up spilled products such as solvents and alcohol products; worked with carbolic acid; and filled drums with brucine sulphate.

Petitioner testified that in the alcohol-denaturing plant respondent made consumer products, including mouthwash, codeine for chocolates, embalming fluid, iodine, shellac, shaving lotion, and nicotine. Petitioner also stated that spills occurred weekly or bi-monthly. When the spill was being cleaned: "You don't hardly get your breath in there in an enclosed room *** from the fumes, but we did have to get it out, that was the only way to get it, was get a squeegee and brush her to the drain."

Various labels used on drums filled with chemicals were introduced into evidence. A label for methanol read: "Avoid prolonged inhalation." Labels for butyl acetate, butyl alcohol and ethyl acetate read: "Avoid prolonged breathing of vapor. Use with adequate ventilation." A label for acetone read: "Use with adequate ventilation." A

label for vinyl acetate read: "Use with adequate ventilation. *** Avoid prolonged or repeated breathing of vapor." A label for ethyl ether read: "Avoid breathing vapor. Inhalation of vapors may cause rapid loss of consciousness and death by asphyxiation. *** Use with adequate ventilation."

Petitioner testified that he began experiencing problems with coughing and sore throats in the early 1960's, and that he had not suffered these problems prior to that time. In October 1965 he was hospitalized for 10 days, and the diagnosis was acute right lower lobe bronchopneumonia, maxillary sinusitis, and dermatitis caused by a drug allergy. He was again hospitalized in 1971 for bronchopneumonia and chronic bronchitis. In January 1972, petitioner's respiratory problems continued and he began coughing up blood; he was again hospitalized for bronchopneumonia. During the next two years, petitioner continued working but noticed that his work rate was slower, his coughing worsened when he worked with vinyl acetate, and his coughing up of phlegm worsened.

In July 1974, while inside an ether car attempting to clean out embedded sludge with steam, petitioner noticed that his throat was sore and he was nauseated. That night he began coughing up blood clots. Petitioner was hospitalized, and the medical record reads: "He works at U.S. Industrial Chemical Company and was exposed to some fumes in a tank car and the irritating gas started to effect his bronchial tubes and then he has continued to cough ***." The diagnosis was bronchopneumonia and severe chronic bronchitis. He was released from the hospital after a week, and returned to work six or seven weeks later.

Petitioner felt that he "was going downhill" after returning to work. He became ill using the solvents in the ethylene unit. He was transferred to different positions, including one involving cleaning the boilers. This resulted in breathing dust particles and flue gas from the burning coal. Petitioner was coughing up black substances and had trouble climbing.

In November 1977, petitioner was hospitalized for severe obstructive pulmonary disease, pulmonary emphysema and lateral bronchopneumonia. He has not worked since that time. At the time of the arbitration in 1980, petitioner's lungs were full, he had chest pains, arthritis of the spine, eye problems, and had trouble with his legs, breathing and nausea.

Dr. John Jemsek has treated petitioner since 1958. His report in 1978 stated that petitioner had been unable to work since 1977, and that he had chronic bronchitis, bronchiectasis, and emphysema. Dr.

Jemsek believed that petitioner would never be able to work again. In 1978, Dr. Jemsek referred petitioner to Dr. John Houseworth, a specialist in pulmonary medicine. Dr. Houseworth's report stated that petitioner suffered from chronic bronchitis, bronchiectasis and pulmonary emphysema.

Dr. Edwin Rayner Levine, director of respiratory care at Edgewater Hospital, testified for petitioner that he examined petitioner and performed tests on August 8, 1978. His diagnosis was pulmonary fibrosis, pneumonitis, bronchitis, probably granulomatosis, and chronic obstructive pulmonary disease. Over respondent's objection, the arbitrator permitted Dr. Levine to answer a hypothetical question. Dr. Levine opined that if a man was in good health until he was exposed to fumes and dust from sulfur, sodium silica fluoride, sulfuric acid, phosphoric acid, vinyl acetate, denatured alcohol, acetone, ethyl acetate, butyl acetate, methyl alcohol, butyl alcohol, ethylene, polyethelene, ethyl acetate, brucine sulphate and sulfuric acid, coal dust, and flue gas, and hydrocarbon fumes, "the state of ill-being in the described individual was the direct result of the exposure to the chemicals described in the course of his occupation." Dr. Levine also stated that the individual would not be capable of any gainful employment. Dr. Levine said that every one of the gases except carbon dioxide is irritating or damaging to the lung; that ethylene is an irritant that damages the eyes, mouth, throat, bronchi and alveoli of the lungs; that the acids mentioned irritate and damage lungs; that the alcohols mentioned are also irritating to lungs; that sulfuric acid is one of the most damaging chemicals because when it hits the wet membranes of the bronchi and lungs it acts as an acid, resulting in inflammation and scarring; that sodium silica fluoride is irritating; that flue gas causes permanent damage to the lungs; and that fine ash produces irritation in the lungs. Dr. Levine found that any one of the chemicals was capable of causing lung damage, "and the combination of these, without any question, [would] damage any lung that was exposed to these." Dr. Levine was of the opinion that petitioner's cigarette smoking did not cause the diseases he suffered from, but that the diseases were caused by "the inhalation of the toxic materials mentioned." Dr. Levine also found that exposure to these substances could aggravate any damage caused by earlier emphysema or pneumonia. He concluded that petitioner suffered from a progressive condition that would shorten his life.

Respondent based his objection to the hypothetical question and Dr. Levine's opinion on the premise that many of the facts contained in the hypothetical question were not in evidence since Dr. Levine's

deposition was taken prior to the hearing before the arbitrator. It also argued that petitioner was not in good health before 1958 because he had pneumonia in 1943 and because his preemployment X rays indicated that he had emphysema.

Dr. Curtis Krock examined petitioner on August 7, 1979, at respondent's request. Dr. Krock diagnosed petitioner as having chronic bronchitis, pulmonary emphysema and possibly bronchiectasis. He stated that petitioner had a relatively severe obstructive disease but that petitioner could perform some sedentary job that did not require much outdoor work or exposure to dust and fumes. Dr. Krock did not "feel one could reasonably attribute his present condition to the circumstances of his employment." These conditions could occur in persons who had never had any unusual dust or chemical exposure. Bronchiectasis was an unusual complication of chemical exposure and usually occurs only after massive exposure to ammonia or chlorine gas. Dr. Krock believed that petitioner's smoking and pneumonia sufficiently explained the bronchitis and emphysema. Petitioner told Dr. Krock that his trouble started after the 1970 pneumonia. Exposure to alcohol, ketones and acetones would cause damage to the central nervous system, but not permanent lung damage.

Mr. Elmer Alsmeyer, chief chemist for respondent, testified for respondent and contradicted petitioner's testimony in many respects: sodium silica fluoride was not a fine powder, but a coarse, granular material which was never scooped; sulfuric acid does not produce sludge in a tank car; chlorine did not come in drums; no solvents were used to clean in the ethylene unit; and coal ashes were not of respirable size. He also differed with petitioner as to how the boiler functioned. Alsmeyer also stated that by-products of dibasic acid included isosubasic acid and subasic acid, and that sodium silica fluoride was produced in the phosphoric acid unit. Mouthwash, embalming fluids, pure iodine, nicotine and after-shave lotions were never produced in the denaturing plant, and respondent's plant at Tuscola only produced industrial chemicals. Finally, Alsmeyer testified that his test results for the denaturants acetone, methyl ketone, rubber hydrocarbon solvent, ethyl acetate, methanone, ethyl ether, methyl alcohol, methocel, fuile ketone, acetone NF, and wood alcohol were consistently below the OSHA and industry standards. On cross-examination, Alsmeyer testified that some substances manufactured in the denatured alcohol unit are corrosive to human tissue. Mr. Roy Cranmer, area superintendent for respondent, testified that the loading and unloading process in the denaturing plant would not expose the worker to fumes because the process was performed in an enclosed operation.

The arbitrator found that petitioner's exposure to hazards in his employment with respondent resulted in an occupational disease and that the disease arose out of and in the course of employment. The arbitrator also found that although petitioner's cigarette smoking may have contributed to some of the conditions, both Dr. Krock and Dr. Levine agreed smoking could not account for all of the diseases. The arbitrator stated that Dr. Levine found exposure directly caused petitioner's condition, and that Dr. Krock found petitioner's bronchiectasis was caused by the series of pneumonias he suffered, and that the pneumonia could have been caused by chemical fume exposure.

On review, the Commission adopted the arbitrator's findings noting that the arbitrator relied on Dr. Levine's testimony. In reference to respondent's objection that the hypothetical question's inclusion of certain facts which were not yet in evidence due to the timing of the deposition, the Commission held that, based on *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140 the evidence was properly considered. The Commission noted that Dr. Levine's opinions were based on a hypothetical question containing facts he had knowledge of through his own examination and a review of petitioner's medical and employment records, and that his testimony included cross-examination by respondent wherein he repeated his opinion that petitioner's occupational exposure was a cause of his present condition. The circuit court confirmed the decision of the Commission, holding that the findings were not against the manifest weight of the evidence.

On appeal, respondent contends that the Commission erred in considering the opinion of Dr. Levine which was based on a hypothetical question which contained facts not yet in evidence. The Commission relied on *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, where our supreme court adopted Federal Rules of Evidence 703 and 705, which allow an expert witness to base his opinion on facts perceived by him or known to him at or before the hearing. If the facts are of a type reasonably relied on by experts in the field, they need not be admissible in evidence. Respondent argues that *Wilson* is not applicable because that opinion states that its holding applies only to cases filed on or after February 3, 1981, or in which the trial commenced on or after September 1, 1981. Here, petitioner filed his application for adjustment of claim on November 22, 1978, and Dr. Levine's deposition was taken on June 20, 1979. The hearing before the arbitrator commenced on March 6, 1980, and the arbitrator's decision is dated April 20, 1981. The arbitrator, however, made no rulings on respondent's objections to the hypothetical question. We find that

these dates are not determinative of the issue before us.

The petition for review before the Commission was filed May 6, 1981, and proofs for the hearing on review closed on April 28, 1982, and oral argument took place on January 6, 1983. The objections made at the deposition were renewed at the arbitration hearing and at the hearing before the Commission. The Commission stated that it would make the rulings which the arbitrator had not made. The Commission also noted that the parties stipulated that if the Commission sustained respondent's objections, proofs would be reopened for Dr. Levine's testimony.

■■ ■ Unlike an appellate court reviewing the decision of a trial court, the Commission has original, not appellate, jurisdiction. (*Gray v. Industrial Com.* (1979), 76 Ill. 2d 552, 394 N.E.2d 1153.) The hearing before the Commission is neither a trial *de novo* nor merely a review of the record, but instead is *sui generis.* (76 Ill. 2d 552, 394 N.E.2d 1153.) It is not until the case is before the circuit court that standards applicable to reviewing bodies are invoked. (*Meade v. Industrial Com.* (1971), 48 Ill. 2d 215, 269 N.E.2d 288.) Thus, when an arbitrator's award is properly contested it does not become the Commission's decision, and instead the Commission exercises original jurisdiction. (See Ill. Rev. Stat. 1983, ch. 48, par. 138.19(b); see also *Wirth v. Industrial Com.* (1974), 57 Ill. 2d 475, 312 N.E.2d 593.) Based on these principles, we conclude that the trial before the Commission commenced after September 1, 1981, and that the *Wilson* rule is applicable.

■ Respondent argues that, even if *Wilson* applies, Dr. Levine's opinion regarding the causal connection was based only on information supplied by petitioner regarding the chemicals to which he was exposed and was not based on facts which are reasonably relied on by experts in the field. Petitioner testified as to what chemicals, gases, and fumes he was exposed to while employed by respondent. Dr. Levine testified as to petitioner's disabilities, based on his examination of petitioner and tests performed on petitioner. Dr. Levine also testified as an expert on respiratory diseases about the effect certain chemicals have on a person. Knowledge of the effect these chemicals have on lungs was knowledge that Dr. Levine held independently. The information was from his own medical training, independent of any hypothetical assumptions he made about petitioner's exposure to those chemicals. Other testimony from Dr. Levine also came from his independent knowledge. He stated that pneumonitis, fibrosis and granulomas are not listed in the Surgeon General's publications as being related to cigarette smoking. Thus, we find that the Commission

could reasonably have found a causal connection between petitioner's employment and his disability, and properly relied on Dr. Levine's testimony. Even if portions of the hypothetical were objectionable, the entire testimony of Dr. Levine is not rendered inadmissible. See *Beloit Foundry v. Industrial Com.* (1976), 62 Ill. 2d 535, 343 N.E.2d 504.

■ Respondent next contends that the Commission erred in adopting the findings of the arbitrator because the arbitrator's decision contained factual errors. The arbitrator stated that Dr. Krock found the bronchiectasis was probably caused by the series of pneumonias petitioner experienced and the pneumonia could have been caused by chemical fume exposure. Respondent points out that Dr. Krock admitted that pneumonia can result from, or be aggravated by, exposure to harsh fumes, but he did not specify the fumes. Respondent also points out that Dr. Krock testified that certain chemical exposures can cause pneumonia but did not specify what chemicals he had in mind.

Our review of the record shows that, after objection, Dr. Krock was asked to include all of the findings relating to petitioner in answering the hypothetical question. Furthermore, Dr. Krock testified that massive exposure to sulfuric acid fumes can lead to pneumonia and produce death. Dr. Krock also received information about the chemical manufacturing process in which respondent was engaged, and had looked up some of the chemicals in question. Dr. Krock stated that petitioner could have developed his condition without any chemical exposure or dust. Yet he also stated that, "I do not feel there is any real good way one can prove or disprove the relationship of his condition in part to some of these exposures." We conclude that the arbitrator reasonably could have inferred that Dr. Krock's testimony showed he believed it was possible that petitioner's condition could have been caused by chemical fume exposure.

Respondent also contends that the arbitrator's decision incorrectly states that Dr. Krock found smoking could not account for all of the lung disease petitioner had experienced. Dr. Krock addressed the heightened sensitivity of a smoker's lung as follows: "[U]nquestionably, these [smoking] patients are much more sensitive in terms of their clinical response. They'll cough more, experience tightness in the chest, experience more sneezing or burning in the presence of respiratory irritants, yes." Dr. Krock also stated that bronchiectasis could not be caused by cigarette smoking, and that the history of pneumonia was the probable cause. Again, we find that the arbitrator could reasonably infer from this testimony that Dr. Krock believed smoking

could not account for all of petitioner's lung ailments.

Moreover, the Commission exercises original jurisdiction and is in no way bound by the arbitrator's findings. (*Berry v. Industrial Com.* (1984), 99 Ill. 2d 401, 459 N.E.2d 963; *National Biscuit, Inc. v. Industrial Com.* (1984), 129 Ill. App. 3d 118, 472 N.E.2d 91.) A judgment may be sustained on any grounds, regardless of whether the specific reasons given in the written decision are correct. (*Material Service Corp. v. Industrial Com.* (1985), 133 Ill. App. 3d 907, 478 N.E.2d 1095.) We also note that the decision of the Commission does not refer to Dr. Krock's testimony, but only states that the arbitrator relied on Dr. Levine's testimony.

■ Respondent next contends that the decision of the Commission was against the manifest weight of the evidence. Where there is conflicting medical evidence, it is the function of the Commission to resolve that conflict. (*Kuhl v. Industrial Com.* (1984), 126 Ill. App. 3d 946, 468 N.E.2d 162.) The Commission's findings will not be set aside on review unless they are against the manifest weight of the evidence. 126 Ill. App. 3d 946, 950, 468 N.E.2d 162.

In finding that petitioner was permanently disabled as a result of an occupational disease which arose out of and in the course of employment, the Commission relied on petitioner's testimony regarding chemicals with which he worked, and on Dr. Levine's testimony. In light of the evidence presented in that testimony, along with the reports of Drs. Jemsek and Houseworth, we cannot discard the permissible inferences made by the Commission, and we find that the Commission's decision was not against the manifest weight of the evidence.

In support of its position that the Commission's decision was contrary to the manifest weight of the evidence, respondent points to the many factual discrepancies between petitioner's testimony and that of Alsmeyer. While Alsmeyer is chief chemist for respondent and has more knowledge of the details of respondent's operation, we find the Commission could have determined petitioner's testimony to be clear and to have sufficiently shown that he was exposed to one or more harmful chemicals, resulting in his disabling condition.

■ Respondent also points to petitioner's failure to introduce evidence regarding the amount, time and duration of exposure, the dosage, or specific chemicals actually involved. The relevant statutory language only requires that the disease appear "to have had its origin or aggravation in a risk connected with the employment and to have flowed from that source as a rational consequence." (Ill. Rev. Stat. 1977, ch. 48, par. 172.36(d).) In reference to time, the statute states

that exposure can be "for any length of time, however short," and that the respondent must be the "employer in whose employment the employee was last exposed *** regardless of the length of time of such last exposure ***." (Ill. Rev. Stat. 1977, ch. 48, par. 172.36(d).) We see no reason to expand this language to include more specific proof requirements.

For the foregoing reasons, the judgment of the circuit court of Coles County confirming the decision of the Industrial Commission is affirmed.

Judgment affirmed.

LINDBERG, BARRY, and KASSERMAN, JJ., concur.

PRESIDING JUSTICE WEBBER, specially concurring:

I concur in the result reached by the majority with great reluctance.

*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, is not appropriate for this case. That doctrine is, and should be, limited to generally recognized and accepted medical records. In substance it is a shortcut on foundation requirements. In the case at bar there is no showing that Levine relied upon any records whatsoever in arriving at his conclusions. For all we know, the hypothetical posed to him must have consisted of what petitioner hoped to prove at trial (*e.g.*, product labels).

The difference between petitioner's testimony of what he worked with at respondent's plant and what Alsmeyer testified to as being produced at that plant is dramatic. However, the entire record appears to sustain petitioner's contention that he was inhaling dangerous fumes.

If I were sitting as the trier of fact, I would have arrived at a different conclusion, but given the deference we must afford to the Commission's decisions in controverted cases, I have no alternative but to concur.