JAMES JARRETT, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (A. E. Staley Manufacturing Company, Appellee).

Fourth District (Industrial Commission Division) No. 4—86—0337WC

Opinion filed June 24, 1987.—Rehearing denied July 30, 1987.

Serkland & Muelhausen, of Chicago (James C. Serkland, of counsel), for appellant.

Robert E. Maciorowski and Julie A. Garrison, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Claimant James Jarrett filed an application for adjustment of claim seeking benefits under the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1981, ch. 48, par. 172.36 *et seq.*) for injuries allegedly sustained while working for respondent A. E. Staley Manufacturing Company. An arbitrator awarded claimant $172.61 per week for 31²/₇ weeks of temporary total disability and $1,615.55 for necessary medical expenses. On review, the Industrial Commission adopted the arbitrator's decision and findings, and also awarded claimant $172.61 per week for an additional 104²/₇ weeks of temporary total disability. On administrative review, the circuit court of Macon County reversed the Commission's decision, finding that it was against the manifest weight of the evidence. Claimant appeals.

■ Initially we note that claimant was moved to strike Staley's brief due to numerous violations of Supreme Court Rule 341(e)(6), which requires that the facts necessary to understand the case be stated accurately, fairly, without argument or comment, and with appropriate references to the record. (107 Ill. 2d R. 341(e)(6).) Claimant has pointed to numerous misstatements, mischaracterizations, misquotations, unfair implications and statements, inappropriate arguments and comments, and inaccurate citations to the record in Staley's brief. We agree with claimant's charge, but we find it would not aid justice to strike Staley's brief. Because of the numerous violations of Rule 341(e)(6), Staley's statement of facts does not aid our decision, and we set forth the facts in detail here after our own thorough review of the record. Our holding in this appeal is in no way influenced, however, by Staley's noncompliance with Rule 341. See *Gibraltar Corp. v. Flobudd Antiques, Inc.* (1971), 131 Ill. App. 3d 545, 269 N.E.2d 515.

In January 1978, claimant began working for Staley as a laborer. In March 1978, he began working with phenothiazine, a chemical contained in large blocks manufactured by Staley and used by the agricultural industry to destroy worms. A label for the medicated blocks stated that 94% phenothiazine was the active drug ingredient. The la-

bel also stated, "Persons exposed to TDA-3 for extended periods of time should use eye, skin, and respiratory protective devices to avoid possible irritation." After several months, claimant suffered from rashes on his neck and arms, dizziness, stomach cramps and headaches. In June 1978, claimant testified that he experienced a seizure. He felt ill, called his mother, and then became unconscious. He had never experienced any of these symptoms prior to working for Staley. His family had no history of seizure disorders.

Claimant testified regarding his duties while he worked for Staley. Beginning in March 1978, approximately twice each week, claimant dumped 42-pound bags of phenothiazine into a machine called a "hopper." He dumped four bags every eight minutes, seven hours a day. This was done about twice a week. In 1978, claimant estimated that he spent 20% of his time dumping bags. In 1979, claimant spent 40% of his time working around the hopper or dumping bags.

When claimant dumped a bag, dust flew up into his face and onto his clothes and skin. The room was filled with the chemical and appeared foggy. When he washed his clothes later, they would fall apart as if they contained acid. Claimant never saw any employees wearing a dust mask. He was issued no protective equipment. The production superintendent told claimant that the chemical was not supposed to harm dark-skinned people.

Claimant testified that there was no dust collection system around the opening of the hopper. On the days he was not dumping bags of phenothiazine, claimant was sweeping the chemical on the third floor while other workers dumped the bags. A great deal of phenothiazine accumulated on the floor during the day. Claimant would fill a wheelbarrow, which was several feet deep and three feet wide. During the summertime, the third floor's 8-foot by 8-foot door was open, and three or four windows were open about eight inches. The temperature was 75 or 80 degrees in the room, and he perspired as he worked.

During 1978, claimant saw the company nurse several times, complaining of a skin rash, stomach aches, headaches, dizziness and blurred vision. He did not tell anyone at work about the seizure because he did not know its cause.

After the seizure in June 1978, claimant saw Dr. Barry Ashkinaz, who prescribed Dilantin, an anticonvulsive drug. In January 1979, claimant suffered another seizure, which was witnessed by his girlfriend. Dr. Ashkinaz hospitalized claimant, but the test results were negative and claimant returned to work. Claimant estimated that he had 10 seizures during 1979. Several times he went to the emergency room for treatment. In June 1980, claimant changed doctors and be-

gan seeing Dr. N. L. Still.

In August 1980, Dr. Goldberg, the company physician, restricted claimant from dumping bags of phenothiazine because of his skin rash. Claimant continued to clean, including sweeping the chemicals on the third floor two or three times each week. Claimant estimated that he had approximately 10 seizures during 1980. Claimant subsequently worked on the first floor as a palletizer, handling the blocks after they were wrapped. Phenothiazine dust was also present on the first floor, but in a smaller amount and for shorter periods of time.

On January 16, 1981, claimant had a seizure at work. He was taking a break after sweeping, but he could not recall if they were running phenothiazine that day. Dr. Ashkinaz was sent for, and claimant was hospitalized. Claimant testified that the seizures always came within several days of working with phenothiazine. Claimant also had seizures on February 3 and June 23, 1981.

Claimant stopped working on December 4, 1981. Dr. Still recommended that claimant work with other people; lift, carry or push no more than 75 pounds; not work with hazardous machinery; work only up to heights of six feet; and not climb telephone or electrical poles. Staley placed claimant on sick leave. Claimant had 15 or 20 seizures between December 1981 and the time of the arbitration hearing on July 22, 1982. The seizures had been witnessed by family members and friends. No doctor or nurse has witnessed a seizure. Claimant reported he had lost 20 pounds, slept often, had decreased energy and libido, and continued having seizures intermittently.

Glodine Joyner, claimant's mother, testified that claimant had no unusual childhood illnesses. Neither claimant nor the family had any history of seizure disorders. When Joyner arrived at her son's home in June 1978, he was unconscious, and she called an ambulance. He remained unconscious for several hours. She has witnessed 10 or 12 seizures since that time. On May 30, 1982, claimant had several seizures before he was brought to the hospital. He was stretched out, screaming, and had respiratory problems. When the paramedics arrived, claimant was having clonic contractions. Paramedics observed similar contractions on two other occasions.

Brenda Buford, claimant's girlfriend, testified that in January 1979 she found claimant lying in a daze. He was having convulsions. His arms and legs became rigid for several minutes. Since that time, Buford has witnessed well over 10 seizures. During the severe seizures, claimant had trouble breathing, perspired, and had strong convulsions. The last seizure prior to the arbitration hearing was on May 30, 1982, when he had five seizures within an hour or two.

Claimant introduced into evidence a March 1981 emergency room report stating that Buford reported claimant had suffered six seizures that day, each lasting about three minutes. An examination revealed aniscoria, with the right pupil dilated. The diagnosis was acute postictal syndrome.

Dr. Ashkinaz's report referred to claimant's hospital admission on January 15, 1979. The report describes two syncopal episodes in the previous seven months.

Dr. Barry Lake Fischer, a physician specializing in occupational medicine, testified for claimant that his examination of claimant on October 17, 1981, revealed normal findings. In answer to a hypothetical question, Dr. Fischer testified that claimant had toxic blood levels of phenothiazine, which could be achieved by way of both inhalation and exposure to the skin. Dr. Fischer based his opinion on claimant's description of a history of occupational exposure to phenothiazine; the skin eruptions which gradually worsened; the seizures; and claimant's description of working without protective clothing or respirators. Dr. Fischer also based his opinion on laboratory findings showing claimant was anemic.

Dr. Fischer also relied upon medical texts and literature where patients developed seizure disorders while on pharmacological, not industrial, doses of phenothiazine. Industrial phenothiazine is stronger than pharmacological doses. While one tablet of pharmacological phenothiazine equaled 50 milligrams, a 42-pound bag of industrial phenothiazine would equal, in a rough calculation, 200,000 pharmacological pills. Dr. Fisher explained that the changes made to phenothiazine to produce the pharmaceutical did not alter its toxic effect on humans. Other medical studies also showed a relationship between phenothiazine exposure and seizure activity.

Because claimant had described the air as foggy with the chemical when he was dumping bags, Dr. Fisher estimated that there was a minimum of 100 parts, or 60 to 70 milligrams, per square cubic meter. This was more than a pharmaceutical dose. If continued exposure on the average of one per week for six months was assumed, the likely effect would be skin eruptions and neurotoxicity, which blood toxicity results in damage to the nerve cells in the head, and thus nerve destruction. This damage causes the seizure activity. No studies had been done on persons exposed to industrial strength phenothiazine.

Because of claimant's repeated exposure, there would be an accumulation in the body. The drug would be ingested mainly through the respiratory system, but also could gain access through the skin if the patient were perspiring. In Dr. Fischer's opinion, the exposure de-

scribed by claimant through June 1978 was sufficient to cause the seizure in June 1978. Dr. Fischer believed that claimant was sensitized because other employees did not exhibit problems working with the drug, and because his skin eruptions indicated a sensitivity to the drug. Other workers exposed to the same environment as claimant probably would not manifest the same symptoms. The drug may metabolize differently in different persons.

Dr. Fischer believed claimant continued to have seizures even after two years of not working with phenothiazine because he had a bilateral central nervous system disfunction, or irritation resulting in seizure focus, and he was unresponsive to normal drug treatment. In this case, although exposure was removed, the consequences of the earlier exposure remained because claimant had central nervous system damage or disfunction.

Dr. Fischer opined that claimant's restrictions of not driving and not working alone were permanent, unless in the future claimant was seizure-free for a year or more, with medication, and then two years or more without medication. Dr. Fischer believed this was unlikely.

Dr. Fischer also testified that he believed claimant actually had seizures because a treating physician would have to have good reason to prescribe the antiseizure drugs which claimant was taking. In addition, an emergency room report showed that claimant was in a postical state. Dr. Fischer stated that this was a positive neurological finding which could not be the result of malingering. The finding of aniscoria indicated that the right and left pupils were of varying sizes. This symptom cannot be feigned, and it is a neurological finding consistent with a post-seizure state. Furthermore, the emergency room report stated that claimant was somewhat incoherent. Dr. Fischer acknowledged evidence that there was a dust collector on the hopper, but stated that in his opinion, based on claimant's condition, the dust collector was either not functioning or not adequate.

Dr. Fischer testified that the condition from which claimant suffered, absent a toxic environment, always occurs in preadolescence and does not suddenly develop in a 38-year-old person. Dr. Fischer concluded: "In this particular setting, any 38 year old male with no history of prior difficulty, prior history of seizure disorder, no family history, no history of alcohol or drug abuse or trauma to the head, the only other possibility is a toxic situation." It is "very unlikely, given claimant's work history, that the condition was caused by exposure to a toxic other than phenothiazine."

James Warnick, the plant superintendent, testified for Staley. Records for 1981 and 1982 showed the amount of phenothiazine used by

Staley. The amounts were similar to the amounts used from January 1978 to August 1980. From August 1980 to March 1981, approximately 119,000 pounds of phenothiazine were on hand or purchased. Forty-two pounds of phenothiazine were used for every ton of the blocks being made for cattle. On the third floor of the plant, an employee opens a bag of phenothiazine and pours it into a hopper approximately every six to ten minutes. When it is used, 180 to 190 bags of phenothiazine would be dumped in a 24-hour period. The operation is seasonal and usually ran in early summer. There is a dust collection system on the hopper. Employees are provided with white jackets and dust masks. Warnick had seen workers without masks and had seen claimant working without a mask. The only complaints from employees during the period of 1964 to 1982 had been about skin rashes. Claimant never complained of seizures.

George Albert, a laborer, testified for Staley by means of a deposition taken in November 1982. Albert had been cleaning and dumping bags for Staley for about 10 years. The hopper has a suction device around the hole in which the phenothiazine is dumped. One bag was dumped every six to eight minutes, usually during the spring and summer. The phenothiazine was run three or four days during some weeks, and not at all during other weeks. Albert spent about 12 days a year dumping bags. Employees had masks, but there had been times when Albert dumped without a mask. The masks were kept in a cabinet, but if they were not found there the employees could ask for one. Staley began supplying masks two or three years ago. Albert never saw claimant wear a mask. Phenothiazine had occasionally come up into Albert's face.

Leo Johnson, a foreman, testified for Staley by means of a deposition taken on November 23, 1982. One of Johnson's duties in 1965 was to dump phenothiazine. At first, he would dump one bag every 18 to 20 minutes. Later, he dumped a bag every eight minutes. When Johnson dumped a bag, the chemical never came flying up into his face. Johnson observed claimant dumping phenothiazine three times when they worked the same shift, and claimant always wore a mask. Claimant never complained to Johnson about any problems he had working with phenothiazine, except once to get a clean smock and new gloves.

Staley introduced Dr. N. L. Still's records into evidence. Dr. Still wrote a letter in 1981 which said, "Although he has been exposed to 'phenothiazines', I do not believe this is the cause of any of his problems. I have checked on two occasions with the Rocky Mountain Poison Control Center to confirm the observation."

Staley introduced into evidence the deposition testimony of Dr. David Shenker, a neurologist, taken on September 2, 1982. Dr. Shenker examined claimant on April 27, 1982, and all findings were negative. If claimant had been suffering from seizure problems, the examination would have revealed that condition. Phenothiazine commonly produces a Parkinsonian state, which is manifested by difficulty walking, rigidity, a tremor, drooling, and altered mentation. None of these symptoms were evident in claimant. Phenothiazine may lower seizure thresholds in some individuals, but the drug does not actually cause seizures.

After several days without exposure to the drug, there would no longer be enough drug in the body to cause a seizure because the drug dissipates fairly rapidly. Dr. Shenker found the fact that claimant continued having seizures after he stopped working to be "absolute proof in my mind that this gentleman did not have seizures secondary to the drug because he was obviously not exposed to the drug at that time unless he, himself, was taking it on his own or performing a function elsewhere where he came across it."

Dr. Shenker believed that if claimant had seizures after taking Dilantin, it would make "one wonder if these were hysterical episodes." Dr. Shenker found it significant that only one seizure occurred at work. Seizures should only occur when there was a very high level of phenothiazine in the system, and if the seizures did not typically occur at work, that was evidence which indicated the seizures were not related to the phenothiazine exposure.

On cross-examination Dr. Shenker testified that persons suffering from grand mal seizure-type episodes could have an examination and EEG which were negative. Dr. Shenker qualified that, "if there were significant amounts of drugs in this gentleman, enough to do that, we would like to see other abnormalities on exam because of the very common other side effects that this group of drug causes." Dr. Shenker agreed that there was room for honest disagreement on any disease, which would "probably" include the seizure condition at issue.

Staley introduced into evidence the deposition of Dr. Michael I. Schaffer, a toxicologist, taken on January 26, 1983. Dr. Schaffer had reviewed claimant's hospital records, the depositions of the doctors who had testified, and Johnson's deposition. Dr. Schaffer testified that phenothiazine would not remain in the system as long as other compounds which were more lipophilic. In answer to a hypothetical question, Dr. Schaffer opined that claimant's industrial exposure to phenothiazine did not result in a seizure disorder. He based his opin-

ion on studies which had shown that such exposure could produce spontaneous epileptic seizures, but upon withdrawing the medication, the seizure disorder disappeared. Dr. Schaffer also commented that the alleged seizure disorder had only been seen by members of claimant's family, was "never seen by any of the neurologists, [and was] never documented by any positive neurological findings."

Dr. Schaffer testified that in one study he relied upon, 10 out of 800 people were affected by the drug, and there was always some type of positive EEG finding. When the exposure to the drug was eliminated, the seizure disorder and abnormal EEG disappeared within several months. Dr. Schaffer did not know of any reported cases of seizure disorder as a result of industrial exposure to phenothiazine. He believed that pharmaceutical grade is better absorbed by the body than pure phenothiazine, and thus would be more likely to do more damage.

In rebuttal, claimant introduced the evidence deposition of Dr. Irving C. Sherman, a neurologist and psychiatrist, taken on December 14, 1982. Dr. Sherman examined claimant on September 13, 1982. The results of the examination were negative. Dr. Sherman stated, however, that in the great majority of people who have recurrent seizures, the neurological examination findings were negative.

In response to a hypothetical question, Dr. Sherman stated that he believed claimant developed a recurrent seizure state as a result of his exposure to phenothiazine. The basis of that opinion was the skin rashes which evidenced a sensitivity to the drug; no prior history nor family history of seizures; no alcohol abuse; and no evidence of any disease of the nervous system from which seizures could occur. The work restrictions placed on claimant by Dr. Still were permanent unless claimant was seizure-free for one to three years. The basis of Dr. Sherman's opinion that phenothiazine would cause seizures was his own experience in several cases and his review of the medical literature. The literature established that "it is a well-known fact that phenothiazine lowers the seizure threshold in animals, and there are many papers on record in which people have reported on the incidents of seizures occurring with moderate and certainly large doses of phenothiazine." The literature implied that patients taken off pharmaceutical dosages stopped having seizures. The fact that claimant's seizures continued even after his exposure to phenothiazine was eliminated led Dr. Sherman to believe "something permanently happened in this man's central nervous system as a result of frequent exposure to some toxic process of the nervous system which now can perpetuate itself."

Dr. Sherman stated that his opinion would change if there was a dust collection system on the machine which adequately avoided the kind of exposure claimant had experienced. He based his opinion, however, on claimant's statement that the dust would fly up into the air in large quantities and on the fact that claimant had a photosensitivity reaction manifested as skin eruptions.

Claimant also introduced the evidence deposition of Dr. Ibraham Farid, a biochemist and physician specializing in occupational medicine, taken on July 15, 1983. Dr. Farid examined the depositions of Drs. Shenker, Sherman, Schaffer, and Fischer. He also reviewed claimant's hospital records. Dr. Farid opined that the cause of claimant's seizure disorder "could have been due to phenothiazine exposure" at work. The basis of Dr. Farid's opinion was the medical records indicating claimant had a seizure problem, and the fact that phenothiazine is known to cause seizure disorders. Dr. Farid also relied on the fact that claimant had no history of seizure disorders prior to working with phenothiazine; other causes such as brain tumors had been ruled out; and the photosensitization or skin reaction suggested that claimant's exposure to the chemical caused damage to him.

From the description of the amounts of the drug handled by claimant, Dr. Farid concluded that a significant amount must have entered his body, notwithstanding the fact that his exposure was for a period of perhaps only three months out of the year. It was significant that claimant wore no mask because something inhaled can go directly to the blood stream. Dr. Farid stated that even if claimant did wear a mask, he would not change his opinion regarding causation because the protective devices were probably ineffective. Dr. Farid concluded that claimant's condition could have resulted from exposure to phenothiazine. Dr. Farid relied on the "definite side effects, which can be skin symptoms, and the knowledge of the metabolism of this compound which has the potential of interfering with the respiratory chain in the brain, as well as the fact that it has properties of getting into the brain and sitting there for a long time and accumulating."

It was significant that claimant was not removed from the source of exposure after his first seizure. He found that continued exposure after that could have caused the development of spontaneous seizures. Dr. Farid referred to the "well-documented" theory called the "kindling phenomenon," which suggests that after repeated electrical stimulation, seizures would develop without further stimulation. Dr. Farid explained that the result is "changes that would then cause lower levels of irritability to the brain later on, even by another material, to cause a problem like a seizure." These studies were done with

electrical, not chemical, stimulation. One study showed that the spontaneous seizures continued for six or seven months after exposure ended. The continued seizure activity, without treatment, then, can cause damage to the brain.

Dr. Farid found it insignificant that none of Staley's other employees had reported seizures. The fact that no one complained did not establish that present and former employees had no similar problems. Also, an accurate study would require the inclusion of thousands of individuals because only a few might have side effects. Moreover, the genetic makeup of people predisposes an ability to handle a drug under given circumstances. The type of compound which includes phenothiazine is metabolized primarily in the liver and the way it is handled varies tremendously from person to person.

Dr. Farid disagreed with Dr. Shenker's opinion that the lack of development of Parkinsonian seizures would not support the development of seizures in claimant. Dr. Farid opined that there was no relationship between seizure development and the development of Parkinsonian symptoms because they are not produced by the same mechanism. Dr. Farid also disagreed with the opinion that phenothiazine was not retained in the body. He found no evidence for that opinion. Dr. Farid also referred to the phenothiazine label, which included instructions not to use the milk of animals for one week after they are exposed to the drug. Dr. Farid interpreted this to mean that the manufacturers of the drug believed the drug could be retained.

Dr. Farid testified that the fact that the examinations of claimant by Drs. Shenker, Fischer and Still revealed no objective evidence of a disorder did not preclude the fact that claimant had a seizure disorder. Idiopathic causes for seizures are usually reported in a younger age group. Moreover, even if there had been a history of seizure disorder, he would find that claimant's exposure to phenothiazine aggravated the condition and precipitated the seizure.

Dr. Farid disagreed with the opinion expressed by Dr. Still in his letter of September 28, 1981. The letter refers to claimant's "problems," but does not specify what the problems were. In addition, the letter does not state the basis of Dr. Still's opinion, except that he called a poison control center. In Dr. Farid's opinion, most treating physicians with a typical clinical practice do not get into the kind of detail which the present case demands.

On August 12, 1982, at Staley's request, the arbitrator went to its plant for an inspection. The arbitrator stated in his decision that during the inspection, the phenothiazine operation was shut down. There was very little dust present on the first floor where the palletizing

takes place. The barrel where the sweepings from the third floor are delivered to the first floor by a chute was only 42 steps from the palletizing area. There was some dust on the second floor, and dust was clearly present on the third floor. The dust appeared to be grain dust. A bag of phenothiazine was cut open and poured into a barrel. The dust did not leave the barrel or come out into the air in the room. In the hopper, there is an agitator mixing other materials when the phenothiazine is added. The arbitrator did not observe this process, but concluded that "it would appear that the phenothiazine and the other materials would get into the air unless prevented from doing so by the vacuum device. There was enough dust on the floor and other surfaces that the Arbitrator is not convinced that the vacuum device is 100% efficient." The arbitrator concluded that claimant had shown "that he was exposed to some airborne phenothiazine dust during the course of his employment by respondent. At times he was not protected against inhaling this dust or against absorbing it through his skin."

The arbitrator stated that claimant had established that he was exposed to industrial phenothiazine; that pharmacological doses of the drug can cause seizure activity; that industrial phenothiazine is chemically capable of causing seizures; and that phenothiazine can be absorbed orally, through the lungs, and through the skin. Claimant also established that he worked intermittently over a long period in conditions in which he breathed, swallowed, and had phenothiazine dust on his sweating skin; that he developed skin lesions which Dr. Fischer said do not develop without dosages of 250 to 600 milligrams; that he has since developed seizures; and that the record contains no other explanation for the seizures. The arbitrator found that the seizures are the result of either the kindling phenomenon, permanent damage to the central nervous system masked by the Dilantin, or the continued presence of residual amounts of the drug in his body.

On review, the Commission heard further testimony from claimant. Claimant's condition had not changed since the arbitration hearing, although he had not been further exposed to phenothiazine. After the arbitration hearing, he had approximately eight seizures in 1982, 10 in 1983, and eight in 1984. He continues to feel depressed after the seizures, and has rashes occasionally on his chest and arms. The commissioner observed a darkened area on claimant's upper chest. Claimant's mother testified that he has seizures approximately once a month. She last observed one on July 2, 1984. It lasted 20 to 25 minutes during which he fell to the floor, gasping and choking for breath. He perspired, lost control of his kidneys, and then slept most of the

day. She noticed no change in claimant's condition since the arbitration hearing.

On November 16, 1984, Staley introduced into evidence the records of doctors who treated claimant after July 22, 1982. Dr. Jack C. Melinger's records recited that on July 9, 1984, claimant gave a history of good health until 1978 "when he became exposed to phenothiazine and developed seizures." Dr. James Still's records after the arbitration hearing were also introduced. Claimant reported several seizures in 1981 and 1982. On November 9, 1984, it was noted that claimant had an appointment with another doctor and "will not be seen here again."

Dr. William Franklin's records were introduced by Staley. Dr. Franklin saw claimant on January 31, 1984, and claimant had a "history of seizure disorder, questionably related to prior phenothiazine exposure." On February 1, 1984, Dr. Franklin wrote to claimant, stating that "as of this date I no longer wish to provide medical care for you."

The Commission found that claimant's condition of ill-being was causally related to his exposure to the hazards of an occupational disease; that the last exposure was on December 14, 1981; that he was temporarily totally disabled to July 24, 1984, for an additional $104^{2/7}$ weeks; and that the arbitrator's findings were otherwise affirmed. The case was remanded to the arbitrator for further proceedings.

On April 8, 1986, on administrative review, the trial court found that the Commission's decision was against the manifest weight of the evidence because claimant "clearly failed to show any causal connection between the alleged seizure activity and exposure to phenothiazine while in the employ" of Staley.

On appeal, claimant contends that the trial court erred in reversing the decision of the Commission because it was not against the manifest weight of the evidence.

 In order to recover benefits under the Workers' Occupational Diseases Act, a claimant must establish the existence of a disabling disease and a direct causal connection between the disease and a condition of his employment. (*Payne v. Industrial Com.* (1975), 61 Ill. 2d 66, 329 N.E.2d 206.) A disease is deemed to have arisen out of the employment if it is apparent to the rational mind, upon consideration of all the circumstances, that a causal connection exists between the conditions under which the work is performed and the occupational disease. (Ill. Rev. Stat. 1981, ch. 48, par. 172.36(d).) Claimant's seizure disorder is an occupational disease under the Act if his exposure to phenothiazine creates a risk of contracting the disease which

is greater than the risk to the general public. (See Ill. Rev. Stat. 1981, ch. 48, par. 172.36(d); *Zupan v. Industrial Com.* (1986), 142 Ill. App. 3d 127, 491 N.E.2d 753.) Staley challenges the Commission's findings that the work conditions involving phenothiazine created a risk of contracting the disease; that claimant had a seizure disorder; and that the seizure disorder can be connected to phenothiazine. It is within the province of the Commission to resolve conflicting evidence, particularly conflicting medical opinions. (*Fernandez v. Industrial Com.* (1978), 71 Ill. 2d 283, 375 N.E.2d 81; *U.S. Industrial Chemical Co. v. Industrial Com.* (1986), 143 Ill. App. 3d 881, 493 N.E.2d 646.) It is not the function of a reviewing court to determine which of two groups of medical experts is more worthy of belief, to determine whose evidence is entitled to greater weight, or to determine with technical accuracy where the preponderance of evidence lies. (*Grollemond v. Industrial Com.* (1955), 5 Ill. 2d 541, 126 N.E.2d 211.) A reviewing court will not disturb the Commission's findings unless they are against the manifest weight of the evidence. *Caterpillar Tractor Co. v. Industrial Com.* (1976), 63 Ill. 2d 153, 345 N.E.2d 471.

■ We first address Staley's challenge to the Commission's findings regarding claimant's working conditions. Staley maintains that claimant's testimony regarding the specific amounts and time of phenothiazine dumping was contradicted by Warnick, Johnson, Albert and the company use records. The testimony was contradictory. However, neither the testimony of the claimant nor that of the other witnesses regarding the time Staley ran the phenothiazine was supported by the company use records. The chemical was used at least several days during almost every month of the year and was not run mainly in early summer as Warnick testified.

Furthermore, Warnick testified that as much as 119,000 pounds of phenothiazine were kept on hand at one time. Warnick stated that 180 to 190 42-pound bags of phenothiazine could be used in a 24-hour period. In addition, while Albert only spent 12 days a year dumping the chemical, this does not establish how much time other employees spent performing that job. Finally, it would be reasonable for the Commission to infer from all the testimony that an employee dumping the chemical would dump one 42-pound bag approximately every eight minutes. Thus, the Commission could properly conclude that claimant spent a significant amount of time working with the chemical in 1978 through 1980.

Staley also asserts that claimant's description of the absence of ventilation, a dust collection system and dust masks was completely refuted. Claimant testified that the dust flew into his face and onto

his clothes and skin. The room was foggy due to the phenothiazine dust in the air, and a large wheelbarrow full of dust accumulated on the floor. Claimant testified that windows were rarely open; no dust masks were provided; and that there was no dust collection system on the hopper.

■ Johnson testified that the three times he saw claimant dumping, all in 1980, claimant wore a mask. Warnick testified, however, that he had seen workers, including claimant, handling phenothiazine without masks. Albert had seen employees working without masks, and he himself had dumped without using a mask. Albert did not know if claimant used a mask. While Warnick and Albert testified that employees were furnished with masks, Albert stated that in 1982 the masks had only been provided for the past few years. Thus, the Commission could infer that masks may not have been available in 1978, 1979, and 1980 when claimant worked with the phenothiazine.

■ Warnick and Albert also testified that the hopper had a dust collection system. Johson stated that the chemical never flew into his face when he was dumping. Albert testified, however, that the dust would fly in a worker's face if he shook the bag, and that it flew in his face if he shook the bag, and that it flew in his face about once out of one hundred times. The Commission could properly infer from this testimony that at least once every other day on which a worker dumped bags, the phenothiazine would fly into his face. Finally, the arbitrator concluded after his inspection of Staley's premises that there was a great deal of dust around and that the dust collection system, therefore, could not have been 100% effective. The arbitrator's exhibit, a label from the phenothiazine, cautions against working with the chemical without adequate skin and respiratory protective devices. In light of this evidence, the Commission's finding that claimant occasionally worked in conditions in which he breathed and swallowed phenothiazine and had the dust on his sweaty skin was not against the manifest weight of the evidence.

■ Staley also challenges the Commission's finding that claimant actually experienced any seizure disorder at all. Staley asserts that the seizures were not witnessed by unbiased persons and that there were serious doubts that seizures occurred. The Commission was entitled to find that the detailed and consistent testimony of claimant, his girlfriend, and his mother was credible. Moreover, records of the treating physicians and hospital records corroborated claimant's reporting of many of the seizures. Furthermore, the 1981 emergency room report shows a diagnosis of a post-seizure condition which Dr. Fischer testified could not be the result of malingering. Drs. Fischer,

Sherman and Farid found that persons suffering from seizure disorders could have negative findings in a neurological examination. This evidence was strong enough to support the Commission's findings. Even Staley's witness, Dr. Shenker, agreed that there could be negative findings after an examination and EEG on a person who was having seizure episodes.

The fact that claimant did not complain to Staley about his seizures was sufficiently explained by claimant's testimony that he did not know his work with phenothiazine might be a precipitating factor. Claimant did complain to the company nurse and doctor of other symptoms which he thought might be caused by his work condition. The Commission's finding that claimant does in fact experience seizures is not against the manifest weight of the evidence.

The major focus of Staley's arguments relates to the conflict in the medical testimony in regard to the causal connection between seizure disorders and phenothiazine. The Commission was not required to rely on the testimony of Staley's medical experts. Initially we note that the Commission could find Dr. Still's 1981 letter, expressing an opinion that no causal connection existed, to be unreliable. Beyond the fact that he made two calls to a poison control center, the basis of his opinion is unknown.

Staley's statement that Drs. Franklin and Melinger "failed to make any connection" between the seizures and phenothiazine is without merit. Neither doctor expressed any opinion regarding the cause of claimant's seizures. Moreover, the fact that a doctor might not have wished to treat claimant has absolutely no relevance to the determination of the existence of a causal connection.

While Dr. Fischer never before studied the implications of phenothiazine exposure, he is a physician who is board certified as a specialist in occupational medicine, and he has a doctorate degree in pathology. The Commission found him qualified to testify and we see no evidence that this was error. Staley also complains that Dr. Farid neither treated patients for phenothiazine exposure nor extensively researched the area. None of the doctors who testified treated patients with claimant's condition. Moreover, Dr. Farid's extensive and detailed testimony belies any challenge to his research of the drug in question.

Staley maintains that neither Dr. Fischer nor Dr. Sherman could cite documentation involving industrial exposure to phenothiazine. The testimony of Staley's witnesses, however, suffered from the same deficiency. Furthermore, both doctors offered strong testimony regarding the comparability of industrial and pharmaceutical strength

phenothiazine.

Staley repeatedly argues that the causal connection between phenothiazine and seizure activity is "universally unsupported by the studies." All the medical experts testified, however, regarding numerous studies connecting seizures and pharmaceutical phenothiazine. The witnesses' major disagreement centered on whether the drug had a transient effect.

■■ Claimant's medical experts testified as to several theories which could explain why claimant continued to have seizures after his exposure to phenothiazine was eliminated. These theories included the kindling theory; the possibility that claimant's extensive and continued exposure after his first seizure resulted in permanent damage; and the possibility that claimant retained residual amounts of the drug in his system due to his individual metabolic structure. Notably, while none of the cited medical studies documented the long-term effects claimant manifests, none of these studies involved continued exposure after seizures began. The Commission was entitled to rely on the evidence offered by claimant, especially in view of the detailed medical testimony and numerous references to medical studies and literature which were offered in support of the positions. Staley's references to Dr. Farid's theories as being "hatched" by him, or being "farfetched" are merely assertions which do not require further comment by this court.

■■ While Staley relies on the testimony of Drs. Shenker and Schaffer, claimant's rebuttal witnesses offered strong testimony in response to the opinions of those two doctors. It is the province of the Commission, not this court, to determine which witnesses should be relied upon in making a final determination as to claimant's right to receive benefits under the Act. See *U.S. Industrial Chemical Co. v. Industrial Com.* (1986), 143 Ill. App. 3d 881, 493 N.E.2d 646.

Staley complains that the Commission failed "to explain why it disregarded the opinion of the treating physicians in favor of physicians retained by" claimant, and that the trial court rectified that omission. Staley also maintains that the Commission adopted the arbitrator's findings "without considering the issues raised by respondent or the medical evidence in the record."

■■ ■ The Commission adopted the findings of the arbitrator, which referred to the testimony and records of all the physicians. The Commission may adopt the findings and decision of the arbitrator in whole or in part. (Ill. Rev. Stat. 1985, ch. 48, par. 172.54(e).) As discussed above, there was no testimony by any of the treating doctors, or records of any opinions regarding causal connection by these doctors, except for the brief letter by Dr. Still. Moreover, it is within the discre-

tion of the Commission whether it will find specially upon any questions which are submitted in writing. (Ill. Rev. Stat. 1985, ch. 48, par. 172.54(e); *Mid-City Architectural Iron Co. v. Industrial Com.* (1980), 83 Ill. 2d 34, 413 N.E.2d 1248.) Staley does not argue that it requested such special findings or that the Commission abused its discretion in this regard. Furthermore, a general finding by the Commission for one part is, in effect, a favorable finding on each special matter necessary to support the general findings. *A.J. Johnson Paving Co. v. Industrial Com.* (1980), 82 Ill. 2d 341, 412 N.E.2d 477; *Garbowicz v. Industrial Co.* (1940), 373 Ill. 268, 26 N.E.2d 123.

Staley also complains that "for an unstated reason, the case was switched to the other panel of Commissioners." We cannot see how this administrative decision is relevant here.

■■■ Staley next points to Commissioner Cooke's special concurring opinion which "admits *** that he did not participate in the" decision. The decision states that Cooke replaced another commissioner who left the Commission subsequent to the date of arguments in this case. Cooke did not participate in the agreement reached by the other commissioners in this case, but he is authorized to sign the decision under the rule set forth in *Zeigler v. Industrial Com.* (1972), 51 Ill. 2d 137, 281 N.E.2d 342.

For the foregoing reasons, we hold that the Commission's finding that a causal connection exists between claimant's state of ill-being and his work condition is not against the manifest weight of the evidence. The trial court erred in reversing the decision of the Commission.

■■■ In view of our holding, we need not address the additional issues raised by claimant. Because it has not yet been determined whether claimant's disability has reached a permanent condition, we remand the cause to the Commission with instructions to make this determination and to award additional benefits if appropriate. See *Fleming v. Industrial Com.* (1983), 95 Ill. 2d 329, 447 N.E.2d 819.

Accordingly, the judgment of the circuit court of Macon County is reversed and the cause is remanded to the Commission for further proceedings consistent with the holdings herein.

Reversed and remanded.

BARRY, P.J., and WOODWARD, McCULLOUGH, and KASSERMAN, JJ., concur.