SERVICE ADHESIVE COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION et al. (Hayward Rorie, Appellee).

First District (Industrial Commission Division)   No. 1—91—0656WC

Opinion filed February 28, 1992.

Terrance J. Van Driska and Mark A. Potter, both of Chicago, for appellant.

Guth & Coughlin, Ltd., of Chicago (Glen J. Guth, of counsel), for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Claimant, Hayward Rorie, filed an application for adjustment of claim pursuant to the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1983, ch. 48, par. 172.36 *et seq.*) (the Act), in which he alleged that he had contracted leukemia as a result of his exposure to the chemical benzene while in the course of his employment with the respondent, Service Adhesive Company. The arbitrator found the claimant's leukemia was causally connected to his occupational exposure to benzene during the course of his employment and awarded the claimant 422²/₇ weeks for temporary total disability, permanent and total disability, and medical expenses in the amount of $12,905. On appeal, the Industrial Commission (the Commission) affirmed the decision of the arbitrator, and the circuit court of Cook County confirmed the Commission's decision. The respondent appeals. We affirm for the reasons set forth below.

At the hearing before the arbitrator, the claimant testified that he was married and that he had two children. The claimant had worked for the respondent as a glue maker from 1979 until April or May 1981. Prior to his employment with the respondent, he had worked for three months for Ingrid Plastics in shipping, and before working for Ingrid, he had been employed by Martin Box Factory.

According to the claimant, he had only a tenth-grade education, but in the course of his employment with the respondent, he was taught to read written formulas for making glue. These formulas required the claimant to use certain chemicals to manufacture the glue, and he recalled that the names of some of these chemicals were formaldehyde and benzene. The formulas for the different types of glue were given to him by his supervisor, Robert Harris, and the formulas were returned to his supervisor when he was finished.

In making different glues, the claimant extracted a chemical from a 55-gallon drum into a three- or five-gallon pail and poured the chemical into the the top of a mixer with the other ingredients called for in the formula for the glue. When the claimant poured the chemical into the mixer, the chemical "splashed over everything." One of the drums from which the chemical was removed was black and was marked "benzene" in white and gray lettering engraved on the top of the drum. The claimant used the liquid from the drum labelled "benzene" once or twice a day.

The claimant performed his job duties in the "cold glue room," *i.e.*, a separate room where the glue was made without heat. The claimant worked at making glue eight hours per day, five days a week, and he worked a couple of hours of overtime every week. The cold glue room had one window in it. In performing his work, the claimant wore cloth gloves, but he did not wear a mask over his face. In addition, the respondent did not provide a shower to remove the chemicals from his body. When the claimant poured the benzene into the top of the mixer, he became dizzy and weak from inhaling the fumes, and his skin on his hands and face itched and burned.

In April or May of 1981, the claimant saw Dr. Guralnick for hemorrhoid problems, and at that time, he was admitted by the doctor to Westlake Community Hospital for a hemorrhoidectomy. While hospitalized, the claimant called the respondent and talked to the secretary, Gerry, and informed her of his hospitalization. He asked Gerry to notify his supervisor. Gerry asked the claimant what hospital he was in and he told her.

During his hospitalization at Westlake, Dr. Krasnow took a blood sample from the claimant. Because an analysis of the blood sample revealed an abnormality, the claimant was referred to Dr. Messmore at Loyola University. The claimant has been treated by Dr. Messmore since that time. In 1981 and 1982, the claimant saw Dr. Messmore every week and in 1983 and 1984, every other week. In 1985, the claimant was readmitted to the hospital for chemotherapy. After this hospitalization, the claimant saw Dr. Messmore every other week in 1986 and 1987. After 1987 and until the current time, the claimant visited the doctor once a month. At each of the claimant's visits, the doctor takes a blood sample to monitor his condition. The claimant had been hospitalized seven or eight times over the last seven years.

In 1981, the claimant was very sick, weak and dizzy. In addition, he lost weight until he was only 117 pounds. The claimant testified that he has not worked for the respondent since April or May 1981, and that he has not looked for employment as his doctor told him he could not work due to his illness.

When the claimant worked for the respondent, there were seven persons employed, including the bosses. Other workers who were employed when the claimant worked for the respondent were William Bosley, Glen Bosley and Lavelle Chandler. According to the claimant, William Bosley usually did deliveries and pickups for the respondent, but upon occasion, Bosley would help out with making the glues.

The claimant admitted that he has sickle cell anemia trait, and that two of his sisters and his mother also have this condition; how-

ever, no other family members have leukemia. Before the claimant worked for the respondent, he never experienced the symptoms he had in 1981.

William Bosley testified that he had worked for the respondent from 1967 until 1982. When he was first employed by the respondent, he was a truck driver, but in 1970 or 1971, Bosley became a foreman. As foreman, Bosley was the "main cook," and he did "all of the cooking in the bag room." Bosley explained the term "cooking" referred to the mixing of the different chemicals used in the making of the type of glue. To make the glues, Bosley used formulation cards. Because of his duties, Bosley was familiar with the chemicals used by the respondent in the glues. Some of the chemicals Bosley used for making glue were formaldehyde, benzene, caustic potash, caustic soda, paraffin wax, and "VMP." These chemicals were delivered to and stored on the premises of the respondent. Bosley described the containers in which the chemical benzene came in as being a 55-gallon, two-tone, grayish drum with the name of the chemical on the drum by either a label or an engraved stamp on top. If the drum had a label on it, the label was yellow. According to Bosley, whether the drum had a label or was engraved depended on the source of the chemical.

Bosley cooked for the respondent until the respondent got a tractor-trailer in 1978. After that time, he resumed driving a truck for the respondent. However, whenever the truck was not running, Bosley helped make glue, and he did so during the time that the claimant was employed by the respondent.

In addition to the foregoing testimony, the claimant offered into evidence the medical records of Westlake Community Hospital and Foster McGaw Hospital (Loyola University) and the evidence deposition of Dr. Daniel Hryhorczuk. In Dr. Hryhorczuk's depositon, taken on December 22, 1988, the doctor testified that his specialty is occupational medicine and clinical toxicology. The doctor explained that occupational medicine deals with the diagnosis, treatment and prevention of work-related illnesses, while clinical toxicology deals with the diagnosis and treatment of poisons.

Dr. Hryhorczuk first saw the claimant on June 24, 1987. As part of his examination of the claimant, the doctor reviewed the claimant's medical records. Dr. Hryhorczuk was given a history by the claimant, in which the claimant told the doctor that in February 1981, he began experiencing weakness, weight loss, dizziness, fever and night sweats. In May 1981, the claimant went into the hospital at Westlake Community Hospital for a hemorrhoidectomy, and during this hospitalization,

he was found to have an abnormal blood count. Subsequently, the claimant was admitted to Loyola University's Foster McGaw Hospital for further work-up. A bone marrow biopsy done at Foster McGaw Hospital revealed the claimant had acute myelocytic leukemia. At that time, the claimant underwent induction therapy for this condition.

The claimant was readmitted to Foster McGaw Hospital in July 1981 for consolidation therapy. In November 1981, the claimant was hospitalized for treatment to his right eye, which was also related to his leukemia. In March 1985, the claimant suffered a relapse of his leukemia and received reinduction therapy. In addition to the leukemia, the medical records revealed that the claimant also is positive for sickle cell trait.

The claimant told the doctor that he smoked one pack of cigarettes per day for 16 years, but that he quit smoking several years ago. The claimant admitted that he occasionally drank alcohol, but he denied intravenous drug abuse. The claimant's work history given to the doctor was consistent with his testimony at the arbitration hearing, *i.e.*, that he worked for Martin Brothers Box Manufacturing Company as a machine operator from 1976 to 1978, and that he worked for Ingrid Blasting Company in the shipping department for three months in 1979. The claimant was not exposed to chemicals at either of these places of employment.

The doctor was informed that the claimant had worked for the respondent as a glue maker from September 1979 until April 1981, and that his duties included mixing ammonia, formaldehyde, chlorathane, caustic soda, potash powder and benzene for the production of glue. The claimant told the doctor that he carried three- to five-gallon pails of liquid solvents from 55-gallon drums and poured the liquid into a mixer. The claimant handled a few gallons of benzene per day, and he inhaled the vapors of the benzene, which made the claimant dizzy and intoxicated. This work was performed in a cold glue room that was 50 feet by 30 feet by 15 feet, and the room had two windows, no exhaust fans, and a door which was open during the summer months. The claimant was equipped with cloth gloves and a work uniform by the respondent for his job, but no shower facilities or medical surveillance was provided. The claimant occasionally splashed chemicals on the cloth gloves.

The doctor was informed that the claimant had no cancer in his family. The doctor's findings regarding the claimant were based upon the claimant's history, the doctor's examination, and the claimant's medical records. The doctor found that the claimant suffers from acute myelocytic leukemia, which was in remission at the time of the

doctor's examination. In the doctor's opinion, the claimant's leukemia was most likely caused by the claimant's occupational exposure to benzene.

Dr. Hryhorczuk explained that acute myelocytic leukemia is a malignancy of the bone marrow which affects the myelocytic cell line. A person who has this condition can go into remission with therapy, *i.e.*, there is a disappearance of the signs and symptoms of the disease, and a remission may last for months or for years. However, the doctor stated that the claimant's condition was permanent, and that there is no cure for his leukemia. In the doctor's opinion, the claimant could work at a desk job or from home, but he is severely restricted in the kinds of work he can do, and he would not advise the claimant to work in areas where he may sustain trauma, where he may be exposed to infectious agents or where he is required to do heavy physical labor. In addition, the claimant will require continued medical care and observation, in that he will require outpatient visits to monitor his blood count; he will need treatment of complications as they arise; and he may require further therapy for a new onset of the leukemia. The claimant's need for continuous medical care may interfere with or make continuous employment difficult. Dr. Hryhorczuk stated that there was no evidence linking sickle cell trait with an increased risk of leukemia.

On cross-examination, Dr. Hryhorczuk explained that there are various types of leukemia, but that the claimant's type is caused by benzene. The doctor believed that, while there is no medical certainty, medical science knows with a "high probability" what the causes of leukemia are. With the type of leukemia the claimant has, the route of exposure to the benzene is usually through inhalation and skin contact. Dr. Hryhorczuk did not believe that cloth gloves were an adequate barrier to prevent skin contact, and, in fact, the cloth gloves would retain the benzene and result in higher exposure. The doctor explained that a person with acute myelocytic leukemia may have mild symptoms of the leukemia for weeks or months before there is clinical recognition of the condition, but in his experience, the symptoms would not be present for years prior to discovery. Further, in acute forms of leukemia, such as here, "they're [acute forms of leukemia are] fairly aggressive and present with symptoms fairly soon." Dr. Hryhorczuk was unaware of any epidemiologic studies linking smoking with leukemia. Dr. Hryhorczuk admitted that the claimant had no symptoms of the disease at the time of his examination; however, he explained that patients may go into prolonged periods of remission.

The medical records of the hospitals, which were admitted into evidence, corroborated the claimant's testimony that he went into the hospital for a hemorrhoidectomy on May 14, 1981. At the time of his admission into the hospital, the claimant was 6 feet 1 inch tall and weighed 165 pounds. A pathology report of a bone marrow biopsy done on May 16, 1981, gave a diagnosis of acute myelomonocytic leukemia. At Foster McGaw Hospital, the claimant's acute myelomonocytic leukemia was confirmed on June 9, 1981. The claimant was treated with chemotherapy for his leukemia, and in November 1981 he was found to be in remission. In 1985, the claimant had a relapse of his leukemia and was again given chemotherapy, which caused him to have a second remission. In 1987, the claimant was still in remission and had been in remission for two years. The medical records reflected that for his leukemia the claimant's treating doctor from Foster McGaw Hospital was Dr. Messmore.

Robert Harris testified for the respondent that he had been employed by the respondent during the claimant's period of employment. During that time, Harris was production manager and the claimant's supervisor, and as such, he was familiar with the chemicals used by the respondent. Harris denied that the chemical benzene was used by the respondent from 1979 to 1981, but he stated that a chemical called benzoflex was used. According to Harris, the benzoflex did not contain any benzene by-products. Harris also testified that the claimant did not inform him personally that he was ill from working with materials at the company.

On cross-examination, Harris admitted that written formulas, which gave the contents of the products, were used by the respondent. Harris did not bring any of the formulas with him to corroborate his testimony.

Dr. William Brice Buckingham testified in his evidence deposition of May 18, 1989, that he had examined the claimant on February 10, 1988. His clinical findings on that date revealed that the claimant was 43 years of age, well developed, well nourished, cooperative, 74 inches tall, and 206 pounds. He did not find the claimant acutely or chronically ill on the date of his examination. On the basis of the doctor's clinical findings and laboratory findings, he found no evidence of a disease process. In his opinion, the claimant could be actively employed based upon his findings.

On cross-examination, Dr. Buckingham stated that he did not know Dr. Hryhorczuk, and that he did not have a specialty in clinical toxicology. The doctor testified that he had treated patients with bone

marrow malignancies, bone marrow suppression, and bone marrow hyperplasia.

From the foregoing evidence, the arbitrator found the claimant's acute myelocytic leukemia was causally connected to his industrial exposure to the chemical benzene while employed by the respondent. The arbitrator awarded the claimant temporary total disability, permanent and total disability and medical expenses for his condition. The Commission subsequently affirmed the arbitrator's decision, and the Commission's decision was confirmed by the circuit court.

■■ On appeal, the respondent contends that the Commission's decision was against the manifest weight of the evidence. Under this issue, the respondent specifically argues that the Commission erred in finding that (1) the claimant was exposed to the chemical benzene during the course of his employment, (2) timely notice of the claimant's condition was given to the respondent, (3) the claimant is permanently and totally disabled as a result of his condition, and (4) the claimant was entitled to $12,905 in medical expenses. The respondent also contends that it was denied due process of law by the Commission, as the arbitrator did not make specific findings of fact and conclusions of law as required by statute but instead merely signed a document containing finding of facts and conclusions of law which was prepared by the claimant's attorney. In response to the respondent's issues, the claimant asserts initially in his brief that the respondent has waived the issues of exposure to benzene, timely notice, medical expenses, and due process because it has not cited to authority or to the pages of the record in support of its arguments, and therefore, the respondent's brief is not in conformance with Supreme Court Rule 341(e)(7). (134 Ill. 2d R. 341(e)(7).) The claimant is correct, and under the supreme court rule and the case law, this court is not required to consider those issues not supported by citation to authority or to references in the record. (*Britt v. Federal Land Bank Association* (1987), 153 Ill. App. 3d 605, 505 N.E.2d 387.) However, the respondent did cite to authority on the issue that the Commission's decision that the claimant is permanently and totally disabled is against the manifest weight of the evidence, and this issue must be addressed.

■■ Further, despite the respondent's failure to cite authority, we will, in our discretion, consider two of the issues raised by the respondent, *i.e.*, the respondent's issue of whether the claimant was exposed to benzene during the course of his employment and the issue of whether timely notice of his condition was given to the respondent. With regard to the issue that the Commission's finding that the claimant was exposed to benzene during the course of his employment was

against the manifest weight of the evidence, the respondent asserts that the claimant's evidence that he was exposed to benzene during his work was contradicted by the respondent's witness, Robert Harris. The respondent contends that Harris was a more credible witness, but the respondent supports its assertion with facts not of record. In absence of a stipulation, facts outside the record cannot be considered on appeal. *People v. Haas* (1981), 100 Ill. App. 3d 1143, 427 N.E.2d 853.

It is well established that it is the province of the Commission to resolve disputed questions of fact, including those of causal connection; to draw permissible inferences; and to judge the credibility of the witnesses. (*Beeler v. Industrial Comm'n* (1989), 179 Ill. App. 3d 463, 534 N.E.2d 408.) Unless the Commission's decision is contrary to the manifest weight of the evidence, its determination will not be overturned on appeal. (*Beeler v. Industrial Comm'n* (1989), 179 Ill. App. 3d 463, 534 N.E.2d 408.) We do not find that the Commission's determination that the claimant was exposed to the chemical benzene while employed by the respondent was against the manifest weight of the evidence.

At arbitration, the claimant and William Bosley both testified that the chemical benzene was used in the mixing of different glues. Both witnesses testified that they had worked with written formulas which listed the chemicals involved in making the various glues. Each of the two witnesses stated that the benzene was kept in a 55-gallon drum and that the chemical was removed from the drum into three- and five-gallon pails as needed. While the claimant's and Bosley's description of the 55-gallon drums containing benzene differed, the discrepancy was explained by the fact that the chemical came in different containers when it was obtained from a different source. In contrast, the respondent's witness, Robert Harris, testified that there were written formulas for the glues, but that the chemical benzene was not used by the respondent in the manufacturing of the glues. Neither the written formulas nor the labels from the drums were introduced into evidence by either party. Thus, the arbitrator and in turn the Commission were left to decide which of the witnesses was more credible. The Commission determined that the claimant's and Bosley's testimony was more credible, and since this is the Commission's province, its decision in this regard will not be overturned on review.

In its second issue, the respondent contends that the Commission's decision that it was given timely notice of disablement by the claimant was against the manifest weight of the evidence, as the respondent was not given any notice by the claimant. The respondent

argues that the evidence revealed that the claimant called the office of the respondent and talked to a secretary by the name of "Gerry"; that the claimant informed the respondent that he was not able to come to work because he was hospitalized for treatment of his hemorrhoids; and that this notification failed to inform the respondent that the claimant had a disease which resulted from his occupational exposure to benzene during his employment with the respondent. The respondent also contends that it was prejudiced by the claimant's failure to give it timely notice of his disablement, as it was unable to have the arbitrator conduct an on-site inspection of the respondent's premises because the respondent went out of business before the date of the arbitration hearing.

In the Commission's decision, it did not address directly the issue of notice in any of its findings of facts and conclusions of law. The only reference to be found in the Commission's order which possibly related to notice was where the Commission stated:

> "Petitioner stated that in April 1981, he telephoned his supervisor, William Harri [sic], from Westlake Community Hospital, spoke to a secretary named 'Gerry' and informed her that he was in the hospital."

Although the Commission did not directly address the issue of notice, it considered this matter indirectly. The Commission, after making separate findings on several issues, affirmed the arbitrator's decision as to all other matters. In the arbitrator's decision, the arbitrator found that the claimant's telephone call from the hospital constituted timely notice of his occupational illness to the respondent. Thus, by affirming the arbitrator's decision, the Commission indirectly found that the claimant had given timely notice of his occupational illness to the respondent.

While the evidence in the record did not support the determination that the claimant's telephone call to the respondent was notice of his occupational disease, nevertheless, the respondent's issue regarding lack of notice must fail. It has been held that a reviewing court can affirm the Commission's decision if there is any legal basis in the record to support the Commission's decision regardless of the Commission's findings or reasoning. (*General Motors Corp. v. Industrial Comm'n* (1989), 179 Ill. App. 3d 683, 534 N.E.2d 992.) Here, regardless of the Commission's findings, the issue of notice, or the lack thereof, is resolved against the respondent based upon the law and the record.

■ The statute provides as follows with regard to notice:

"There shall be given notice to the employer of disablement arising from an occupational disease as soon as practicable after the date of the disablement. If the Commission shall find that the failure to give such notice substantially prejudices the rights of the employer the Commission in its discretion may order that the right of the employee to proceed under this Act shall be barred.

\*\*\* Notice of the disabling disease may be given orally or in writing. In any case, other than injury or death caused by exposure to radiological materials or equipment, unless application for compensation is filed with the Commission within 3 years after the date of the disablement, where no compensation has been paid, or within 2 years after the date of the last payment of compensation, where any has been paid, whichever shall be later, the right to file such application shall be barred." (Ill. Rev. Stat. 1983, ch. 48, par. 172.41(c).)

From the foregoing language, it is clear that there is no definite time or prescribed form for giving notice, and that the key phrase in the statute is that notice is to be given "as soon as practicable after the date of the disablement." (*Crane Co. v. Industrial Comm'n* (1965), 32 Ill. 2d 348, 350, 205 N.E.2d 425.) The statute further established that a claim will not fail for lack of timely notice to an employer unless (1) the employer is prejudiced by the failure or (2) the employee fails to file an application for adjustment of claim within three years from the date of disablement.

As was noted previously, the record reflects that the respondent did not receive notice of the claimant's occupational disease prior to the filing of his claim. Because we agree with the respondent that timely notice of the claimant's disabling disease was not given but disagree that the failure to give notice bars the claimant's petition, the issue remains as to whether the claimant was otherwise barred from having his claim considered by the Commission.

■ Initially, we consider whether the respondent was unduly prejudiced by the failure to receive timely notice of the claimant's condition. The respondent contends it was prejudiced because it went out of business prior to the arbitration hearing, thereby making it impossible for the arbitrator to conduct an on-site inspection. There was no evidence presented at arbitration that the respondent was out of business. Therefore, since this was a matter outside of the record, it cannot be considered on appeal. (*People v. Haas* (1981), 100 Ill. App. 3d 1143, 427 N.E.2d 853.) The respondent presents no other cogent argument as to why it was prejudiced by the lack of notice. The record

does not reflect any prejudice to the respondent. The respondent presented a witness who testified that there was no benzene used in the manufacturing of the glues at the time the claimant was employed. The respondent also adequately cross-examined the claimant's witnesses. In addition, we note that the record reflects that the claimant's application for benefits was filed in December 1983, but that the first arbitration hearing on the claim was not held until September 29, 1988, almost five years later. This provided adequate time for the respondent to investigate the claim, preserve evidence, and prepare a defense to the claimant's petition. Further, after Dr. Hryhorczuk's evidence deposition was taken on December 22, 1988, the respondent subsequently obtained the evidence deposition of Dr. Buckingham and presented this evidence at a later arbitration hearing, thus providing the respondent further opportunity to respond and to present a defense. We do not find that the respondent was unduly prejudiced by the lack of notice.

■ Similarly, the claimant's application for benefits was not barred as his application for benefits was timely filed with the Commission. Although the date that the claimant became disabled due to his occupational disease is not precisely known from the record provided, the record does establish that the claimant was found to have leukemia in May 1981. There is no medical testimony, other than Dr. Hryhorczuk's testimony, which causally connected the claimant's leukemia to his occupational exposure to benzene; however, in the claimant's application for adjustment of claim, he gives the date of disablement as May 1, 1981, his last date of employment with the respondent. The claimant filed his application for adjustment of claim on December 21, 1983, less than three years after the date of disablement given on his application. Also on his application, the claimant gives his occupational disease as a blood disorder caused by his exposure to the chemical benzene. From this statement, a diagnosis linking his exposure to benzene to his leukemia must have occurred sometime prior to his filing his application and after his last day of work with the respondent in order for him to assert this fact on his application, which would place the respondent on notice as to the claim it would need to defend against. Thus, the claimant met his statutory requirement of filing his application within three years of his date of disablement.

■ The third issue presented by the respondent is that it was denied due process of law by the Commission. As was noted earlier in this opinion, the respondent cited no cases in support of this contention. In addition, the respondent's assertions primarily concern defi-

ciencies in the arbitrator's decision. Without belaboring this issue, suffice it to say that the Commission exercises original jurisdiction and is not bound by the arbitrator's findings. (*United States Industrial Chemical Co. v. Industrial Comm'n* (1986), 143 Ill. App. 3d 881, 493 N.E.2d 646.) In the instant case, the Commission set forth its own findings of facts and conclusions of law, and any deficiencies to be found in the arbitrator's decision (some of which were corrected in the Commission's order) cannot be found to be a denial of due process of law for the respondent.

Further, the respondent waived this issue because it did not raise this issue before the Commission, and in its brief to the circuit court, it made only a broad statement of being denied due process of law but did not argue this point. Failure to present the issue to the Commission waives the issue before the circuit court and, subsequently, to this court. (*Yellow Freight Systems v. Industrial Comm'n* (1984), 124 Ill. App. 3d 1018, 464 N.E.2d 1256.) Therefore, we decline to address the respondent's issue of denial of due process of law before the arbitrator.

█ The respondent has also waived the issue of whether the Commission erroneously awarded the claimant $12,905 in medical expenses. In the respondent's statement of exceptions and brief filed with the Commission, the respondent's complete argument regarding this issue was as follows:

> "The Arbitrator awarded $12,905.00 in medical expenses, although, the bill on the face, shows most of the bills were paid through Blue Cross and other insurance carriers."

This argument is highly lacking in reasons and specifics as to why the medical expenses should not be awarded to the claimant. The Commission, in its order, found that the medical expenses incurred by the claimant were reasonable and necessary, and the respondent's argument fails to persuade this court otherwise.

Similarly, in the respondent's brief to the circuit court, it enumerates the issues for consideration by the court. In this listing, the respondent states: "Whether medical bills paid by Blue Cross and other carriers should have been awarded directly to Mr. Rorie." As was done with the issue of denial of due process, the issue was not argued in the body of its brief. The circuit court did not address the issue of medical expenses in its decision. Failure to adequately argue and present this issue to either the Commission or to the circuit court did not preserve this issue for consideration to this court, and we decline to speculate and consider for the first time on appeal the argument raised by the respondent with regard to the medical expenses.

The respondent's last issue is whether the Commission's decision that the claimant was permanently and totally disabled was against the manifest weight of the evidence. The respondent contends that Dr. Buckingham found that the claimant had no disease process present at the time of his examination, and that based upon the doctor's examination and his laboratory findings, the claimant was able to work as of the date of the examination. The respondent further asserts that Dr. Hryhorczuk's testimony that the claimant was in remission and that the claimant's work activities would be sharply limited was insufficient to show that the claimant was permanently and totally disabled.

In determining whether the Commission's determination was proper, our review is limited to whether the medical evidence in the record was sufficient to support the award, *i.e.*, not against the manifest weight of the evidence. (*United Electric Coal Co. v. Industrial Comm'n* (1978), 74 Ill. 2d 198, 384 N.E.2d 329; *Crane Co. v. Industrial Comm'n* (1965), 32 Ill. 2d 348, 205 N.E.2d 425.) The resolving of conflicting medical opinions as to causal connection is the province of the Commission, and unless against the manifest weight of the evidence, the Commission's decision will not be overturned on review. (*County of Cook v. Industrial Comm'n* (1974), 57 Ill. 2d 24, 310 N.E.2d 6.) Additionally, judicial deference is given to the Commission in cases where the medical testimony is conflicting. *County of Cook v. Industrial Comm'n* (1974), 57 Ill. 2d 24, 310 N.E.2d 6.

■ Dr. Hryhorczuk, a specialist in clinical toxicology and occupational medicine, testified that the claimant's leukemia was caused by his exposure to benzene in the work place. According to the doctor, although the claimant was in remission at the time of his examination, *i.e.*, asymptomatic, the claimant's condition was permanent and there was no cure for the claimant. Further, he would not advise the claimant to work in areas where he may sustain trauma, where he may be exposed to infectious agents, or where he was required to do heavy physical labor. At most, the claimant could do desk work or work from his home, but he was severely restricted in the kinds of work he could do. The doctor also testified that the continuing medical treatment required by the claimant's condition would interfere or would make difficult continuous employment.

In contrast to Dr. Hryhorczuk's testimony, Dr. Buckingham testified that the claimant was free of any disease process at the time of his examination, and that, in his opinion, the claimant was able to work. However, from the record, it is apparent that Dr. Buckingham did not review any of the claimant's medical records but based his

opinion upon his examination and laboratory findings. Because the claimant was in remission, the claimant would appear to be capable of work. However, a review of the claimant's medical records would reveal that the claimant has a serious, life-threatening disease, and the Commission resolved the conflict between the medical experts and based its decision upon Dr. Hryhorczuk's opinion. The Commission's determination that the claimant was permanently and totally disabled was not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County confirming the decision of the Industrial Commission is affirmed.

Affirmed.

McCULLOUGH, P.J., and WOODWARD, STOUDER, and RAKOWSKI, JJ., concur.