GENERAL MOTORS CORPORATION, CENTRAL FOUNDRY DIVISION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (William Kuehn, Appellee).

Fourth District (Industrial Commission Division)   No. 4—87—0745WC

Opinion filed January 19, 1989.

Acton, Meyer, Smith & Miller, of Danville (Thomas R. Smith, of counsel), for appellant.

Richard K. Johnson, of Katz, Friedman, Schur & Eagle, of Chicago, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Claimant, William Kuehn, filed an application for adjustment of claim under the Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.*) for injuries received on May 1, 1980, while in the course of his employment with respondent, General Motors Corporation. At the hearing before the arbitrator, claimant contended that his injuries arose out of and in the course of his employment, which was disputed by respondent. The arbitrator found that claimant's injuries did arise out of and in the course of his employment and that

claimant was completely and permanently disabled and was entitled to receive compensation for life. On review, the arbitrator's decision was affirmed by the Industrial Commission and confirmed by the circuit court of Vermilion County. Respondent appeals this decision.

The only issue raised on appeal is whether the Industrial Commission's determination that claimant's condition arose out of and in the course of his employment was against the manifest weight of the evidence. Respondent contends that there was insufficient direct evidence presented regarding the cause of claimant's injuries to support a finding of an accidental injury arising out of and in the course of claimant's employment pursuant to section 2 of the Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.2).

At the hearing before the arbitrator, claimant testified that he was working as a truck driver for respondent on May 1, 1980. On that date, he was driving a forklift truck in the "hard iron area," when he either hit a pothole or attempted to avoid the pothole and hit something else. Claimant was unable to recall anything after that, and nine days later his wife brought him home from the hospital. Claimant did not remember the name of the hospital or the city where the hospital was located.

Claimant saw Drs. Gene Moore, Fitzhugh-Bell, and Lunsford after he was discharged from the hospital. Claimant testified that he cannot think clearly and that he has persistent daily headaches. Prior to May 1, 1980, claimant did not suffer headaches as constantly as he currently does.

Marlene Kuehn, claimant's wife, testified that on May 1, 1980, she was notified that claimant had had an accident. She was told that claimant had regained consciousness but that he was not acting normally. Mrs. Kuehn went to Lakeview Hospital in Danville, Illinois, and upon her arrival, she was informed that claimant had been transferred to Burnham City Hospital in Champaign.

When Mrs. Kuehn first saw claimant at Burnham City Hospital, claimant did not recognize her. She observed that claimant had a big bump on his forehead above his right eyebrow. The next day, claimant still did not know her and did not know his children. While at the hospital, claimant behaved strangely and was unable to identify common items such as a bicycle.

Mrs. Kuehn brought claimant home from the hospital eight days after his admittance. Within two days of his arrival home, claimant began to have "blackouts" or to "space out," and after the blackouts, claimant frequently slept. Mrs. Kuehn described claimant's "blackouts" as follows: "[H]e starts shaking and his eyes started [sic] rolling

around. And when I called his name, he didn't hear me. He doesn't hear me when he's spaced out." Prior to May 1, 1980, claimant had never had blackout spells. Mrs. Kuehn called Dr. Gene Moore and reported these blackouts to him, and he instructed her to take claimant to Riley Hospital for an electroencephalogram (EEG). She further testified that, at various times, Dr. Moore referred claimant to Drs. Fitzhugh-Bell and Lunsford, and that claimant had seen Dr. Imperial for the purpose of obtaining social security benefits. Mrs. Kuehn corroborated claimant's testimony that he suffers from constant headaches.

The admission records and discharge summary from Burnham City Hospital were admitted into evidence. These records established that claimant had suffered a "head injury" and "cerebral contusion." According to these records, claimant had hit a pothole while driving his forklift and had fallen or had been knocked from the machine, causing him to strike his head and to be knocked unconscious. Claimant regained consciousness prior to his arrival at Lakeview Hospital, but he was bewildered and disoriented. The doctor at Lakeview Hospital found claimant had no specific abnormalities other than his affect being abnormal.

Claimant was transferred from Lakeview Hospital to Burnham City Hospital. Upon admission at Burnham City Hospital, claimant was still disoriented, he had a slight abrasion on his right forehead, and he had a great deal of tenderness in the C7-T1 area posteriorly; however, his reflexes were equal, his handgrips were weak but equal, and his "pupils, fundi, EOMs" and eardrums were normal.

The discharge summary from Burnham City Hospital dated May 9, 1980, noted that claimant was admitted as an emergency following a head injury incurred at work. The exact mechanism of claimant's head injury was unknown, but it was determined that claimant was unconscious at the scene of the accident for about 20 minutes. Dr. Belber, claimant's treating physician, found that claimant was perplexed, confused, and that he had a severe memory deficit upon admission but that claimant's condition improved during claimant's stay at the hospital. The test results of an EEG, a CAT scan (computerized axial tomography), a spinal puncture and skull X rays had revealed no abnormalities. Dr. Belber's final diagnosis of claimant's condition was "[c]losed head injury, with cerebral contusion syndrome, with full recovery."

A letter dated September 12, 1980, from Dr. Gene Moore to Dr. Fred Pierce, respondent's plant physician, was admitted into evidence. Attached to Dr. Moore's letter was a neuropsychological report

by Dr. Fitzhugh-Bell in which the findings of her examination of claimant on July 15, 1980, were summarized. Dr. Moore's letter stated that because claimant gave an incoherent account of his accident, it would probably never be determined what happened. Dr. Moore concluded that claimant "was apparently injured and knocked unconscious in an accident at the General Motors Foundry." Dr. Moore found that it was possible but unlikely that claimant had had a seizure or blackout at the time of the accident, and that claimant's history made it unlikely that he suffered from epilepsy. Dr. Moore confirmed that claimant had had a seizure since he had been discharged from the hospital, but that claimant's EEGs were normal. Dr. Moore was "inclined to believe" that claimant had suffered an injury at work.

According to Dr. Moore, claimant presented the "classical picture of someone who had had a post concussion type of injury," *i.e.*, that claimant "is unable to relate the details of this injury, he complains of headaches, he has blackouts, he is spacey [*sic*], confusion is his predominant symptom, and he acts a little bit on the dumb side." Dr. Moore explained that these symptoms are characteristic of a post-concussion injury and that the symptoms usually present no neurological findings when the traditional tests are performed. Dr. Fitzhugh-Bell's neuropsychological tests confirmed his opinion.

Dr. Kathleen Fitzhugh-Bell's report stated that claimant was interested and cooperative but that he was sad, confused, and tangential. She had administered a wide variety of tests and she discussed the tests results in this report, finding that claimant was impaired in complex reasoning, abstract thinking, and development of concepts; in visual analysis and appropriate shifting of behavior according to concepts or instructions; and in tasks requiring simple motor speed (finger tapping). The tests for aphasic and perceptual disorders revealed that claimant had deficits which do not occur in adults with normal brain functions. Her hypothesis of the possible neurological significance of the tests was that "[t]he neuropsychological rating (Impairment Index) based upon the Halstead neuropsychological indicators which contribute to the Index is consistent with mild but significant cerebral damage and dysfunction."

A letter dated July 12, 1982, from Dr. Thomas Lunsford to Dr. Gene Moore stated that it was Dr. Lunsford's impression that the claimant "probably has a progressive deteriorating type of brain disease, which may have been subtle or symptomatically not existent at the time of his injury, but was probably aggravated by it at that time." Dr. Lunsford said that he could not determine the type of actual injury incurred by claimant on May 1, 1980, but, based on claim-

ant's behavior immediately after the accident, he concluded that claimant had had "some degree of post concussive change, which probably was involved in a further chain reaction and now progressive dementia."

Claimant lastly presented a letter from Dr. Lunsford dated June 15, 1982, which was sent to the Social Security Disability Determination Division. Dr. Lunsford advised in this letter that claimant "seems to demonstrate an organic brain syndrome with some sort of episodic interruption in behavior." He reported that the neuropsychological examination of Dr. Fitzhugh-Bell revealed that claimant had a "considerable amount of organic brain impairment." Further, he found that a recent repeat study by Dr. Fitzhugh-Bell suggested deterioration of cerebral function, implying the possibility of progressive difficulties. In his opinion, he did not believe that claimant would be a very productive individual unless he were in a very protective environment, *i.e.*, an environment in which no intellectual demands were made, in which there was no demand for fine motor movement or movement against time, or in which there was no demand for any degree of motor coordination. He indicated that claimant demonstrated "aphasia, memory loss, [and] severe depression."

Berland Roy testified that on May 1, 1980, he was working for respondent as a lift truck driver when a man named Bill advised him that a man was "down." Roy proceeded to the site of the accident, where he observed claimant lying on his back on the ground with his head next to some "tubs." When he attempted to question claimant, he did not respond. Roy did not examine claimant but only drove the ambulance in which claimant was placed. While at the scene, Roy observed that claimant's hard hat, required wearing when driving a forklift, lay on the back of the seat of claimant's forklift, where it would normally be kept if claimant were not wearing the hat.

Bill Peel testified that on May 1, 1980, at around 8:15 p.m. or 8:30 p.m., he was going to the "hard iron area" when he saw claimant lying on the ground beside his truck. Peel had passed by claimant's truck 10 to 15 minutes earlier and it was his opinion that claimant's forklift truck was in the same position when he found claimant as it had been when he observed it previously.

When Peel saw claimant lying on the ground, he stopped to investigate. He found claimant lying parallel to the left side of the truck approximately three feet away. The forklift truck was stopped and was touching the front of some "tubs." Claimant's head was approximately 18 inches from the tubs. He checked claimant and then went for help. Peel called an ambulance, obtained assistance, and returned

to the site of the accident.

Upon returning to the scene, Peel found claimant in the same position as he had left him. Peel observed a black spot on claimant's cheek from the ground. Peel moved claimant's forklift and when he got into the truck, he noted that the truck was in neutral gear and that it had been turned off. Peel observed that claimant's hard hat and gloves, required safety equipment, were on the hood of the truck behind the seat, where these items are usually kept when not being worn. Peel stated that there were many places in need of repair in the area where claimant had been driving his truck and that some of the potholes were deep. One such nearby hole was to the left and behind claimant's truck.

Richard Newell testified that he did an accident investigation report on claimant's incident. He attempted to obtain a statement from claimant about the accident but claimant was only able to tell him that he was coming around a corner and saw a hole. Claimant could not recall what happened after that. Claimant did not remember Newell when he saw claimant in the hospital.

Newell's accident report revealed that claimant had been at work for 5 hours and 15 minutes prior to the occurrence. According to the report, claimant "stated he saw the hole in the pavement and swerved to avoid it, at this time he hit something and 'the lights went out.'" Newell was unable to find an object that had been hit by the truck. Newell had noted that there was a pothole 2⅝ inches deep with sand in it nearby claimant's forklift, but that the sand did not reveal any tire marks which would match the forklift truck's tires. No witnesses to the accident were found.

Respondent introduced claimant's medical records from Lakeview Hospital into evidence. This record stated that claimant was found unconscious on the ground at work but that he was conscious upon his admission to the hospital. Claimant spoke normally, but he was disoriented, bewildered and he was unaware of the time and the place. Claimant complained of a headache, but the doctor noted no other symptoms. The doctor's diagnosis was that claimant had had a head injury.

An EEG report and CAT scan report were admitted into evidence. The EEG report was normal and the CAT scan report stated that claimant had a "[n]ormal noncontrast CT scan."

A follow-up report by Dr. Belber dated June 5, 1980, indicated that claimant "stutters, gets 'spacey,' [sic] drives his car to different places and doesn't know why he went there, will buy things and not remember he did it, has no interest in things and lack of drive, and

has headaches." Dr. Belber felt that "these are all changes due to his injury; they're in a complex organic psycho-social area, which is most likely related to some sort of basic hypothalamic or frontal lobe injury, which is not detectable by the usual CAT scan, EEG, brain scan testing, but I feel it's most definitely on an organic basis; in any event, it's quite likely that he'll be able to return to work without restrictions, in a couple of weeks, and he was given a note to do so." An addendum by the doctor stated that claimant also had blurred vision.

Claimant was examined by Dr. Jerome Peters, at respondent's request, and Dr. Peters prepared a one-page letter report dated October 21, 1980, based upon his examination. Dr. Peters performed psychological tests which revealed that claimant had "median temporal lobe involvement, maximum on the left." Dr. Peters found that claimant had had one documented seizure since his accident. Claimant was unable to relate any details of his injury but complained of blackouts and of headaches. Neuropsychological tests revealed substandard performance by claimant. Dr. Peters based his opinion of left cerebral involvement on "extinction of the left ear on auditory bilateral stimulation," "dysnomia," "visual letter agnosia," and "tactile form discrimination poorer on the right than left." Dr. Peters found that claimant's "verbal greater-than-other-modality deficit" a "striking" feature of the examination. Dr. Peters concluded his letter by referring to claimant's "concussion and irritative reaction to injury."

Dr. Thomas Lunsford sent a letter dated March 8, 1982, to Dr. Gene Moore summarizing his examination of claimant on this date. Dr. Lunsford stated that the results of claimant's neurological workup were not unusual except for the neuropsychological testing, which suggested that claimant had some sort of organic brain insult. Dr. Lunsford noted that claimant had attended junior college previous to his injury and had made "B's" and "C's" but that now claimant is barely able to read and understand the newspaper, becomes confused, and has difficulty in understanding television programs. Dr. Lunsford found claimant depressed and more so recently because of his son's accidental death.

Dr. Fitzhugh-Bell's report of her subsequent neuropsychological testing of claimant on April 23, 1982, revealed that claimant's abilities had declined since her prior testing of him 21 months before, and that claimant's impairment index was consistent with "at least moderate impairment of cerebral functions." She gave as her opinion that claimant's test "results continue to be consistent with disruption of functions of each cerebral hemisphere, and implicate both hemispheres more diffusely than did the earlier results."

In a letter dated November 30, 1982, to Dr. Pearce from Dr. Gene Moore, Dr. Moore diagnosed claimant's condition as "pre-senile dementia." In Dr. Moore's opinion, claimant had suffered a cerebral insult on May 1, 1980, and that but for his pre-senile dementia, claimant would have recovered uneventfully from this trauma. Dr. Moore could not state with certainty whether the trauma suffered by claimant aggravated his pre-senile dementia.

Additional records introduced by respondent revealed that claimant had fallen down the stairs at home on January 21, 1980. Claimant suffered an acute lumbar strain, and he received treatment for this from Dr. Welty, a chiropractor. Because of his back injury, claimant was unable to work from January 21, 1980, until March 10, 1980. Other medical records revealed that the only medical problems, other than routine complaints, for which claimant received treatment prior to the incident of May 1, 1980, consisted of an ulcer and an acute anxiety attack.

On review before the Industrial Commission, claimant and his wife again testified. Claimant testified that he currently sees Dr. Imperial every month and that he takes three medications. Claimant continued to suffer from daily headaches and his activities consisted of staying home and watching television.

Claimant's wife testified that claimant continued to suffer from blackouts and from headaches. She stated that claimant functions but that he does not function properly, citing as examples that claimant would call her up and tell her he could not find the car when he had not driven and that claimant would interject a statement into their conversations that did not correspond to what they had been discussing.

William Saucier, a retired special agent of the Federal Bureau of Investigation, testified that on two separate occasions, April 1, 1985, and April 18, 1985, he observed claimant get into his car alone and drive away. Saucier followed claimant for only about a mile each time and then he returned to claimant's home to watch for claimant's return. According to Saucier, claimant operated his car in a normal manner in traffic and appeared to have no difficulty with driving his vehicle.

Additionally, the depositions of Dr. Onur Melen, a neurologist, and Dr. Boris Imperial, a psychiatrist, were introduced into evidence. Dr. Onur Melen testified that he had examined claimant on July 11, 1984. He found that claimant's affect was flat, that claimant was depressed, and that he was disoriented and did not know much about current events. Dr. Melen was impressed by claimant's depression, but he also

determined that claimant had a significant cognitive impairment. Dr. Melen explained that cognitive impairment may manifest itself as a result of depression.

When questioned about Alzheimer's disease (formerly senile dementia) as a possible explanation for claimant's condition, Dr. Melen stated that Alzheimer's disease was not traumatic in origin; however, trauma could precipitate, aggravate or accelerate a preexisting organic brain disease. He explained that with Alzheimer's disease, a CAT scan would show an atrophy of the brain. Dr. Melen was uncertain whether claimant's cognitive impairment had an organic basis such as Alzheimer's disease, and that if he were to choose a diagnosis of claimant's condition, he would select "traumatic encephalopathy" in lieu of Alzheimer's disease. He defined "traumatic encephalopathy" as a "term given to individuals who show varying degrees of emotional and cognitive impairment following a significant head injury." Dr. Melen explained that a CAT scan would be negative if a person had received mild injuries; however, it was more likely that an EEG would be positive.

Dr. Boris Imperial's deposition disclosed that he first saw claimant on July 22, 1982, for the purpose of obtaining social security benefits, but that claimant returned to him for treatment on January 18, 1984. In 1982, Dr. Imperial found claimant's cognitive processes very much impaired. Claimant was also disoriented. Dr. Imperial explained that the cognitive process has to do with reasoning, memory, and judgment. He diagnosed claimant's condition as being "psycho-motor epilepsy, an Organic Personality Syndrome, an Organic Affective Syndrome, and an Amnestic Syndrome."

Dr. Imperial reexamined claimant when he began treatment of him in January of 1984. Dr. Imperial saw claimant approximately once a month, and his original diagnosis of claimant, which he made in 1982, remained unchanged. Claimant continued to be confused, to be intellectually deteriorated, to have severe headaches, to suffer from blackout spells (disordered consciousness), and to have his memory impaired. In July 1984, Dr. Imperial also found claimant to be depressed. In his opinion, claimant's depression was caused by his awareness that he was no longer the same person he was before the incident of May 1, 1980, and his awareness of his mental deterioration. Additionally, his son's death contributed to his depression.

Dr. Imperial stated that an EEG and a CAT scan are not 100% diagnostic. He explained that with mild trauma there may not be external signs of injury but that the brain may be severely injured, and that mild head trauma can result in cognitive impairment. He noted

that if the hospital records indicated there was an injury to the right side of claimant's head, that this indicated that there was some evidence of external injury. Dr. Imperial agreed with Dr. Melen's diagnosis of post-traumatic encephalopathy. In Dr. Imperial's opinion, claimant's mental condition and intellectual deterioration were secondary to brain injury, and his condition was permanent.

Respondent contends that the evidence was insufficient to indicate the cause of claimant's injuries, that the evidence presented indicated that no work-related accident occurred, and that claimant's fall was idiopathic. Therefore, respondent argues that the Industrial Commission's determination that claimant's current ill-being was the result of accidental injuries arising out of and in the course of employment was manifestly erroneous.

■ For an injury to be compensable under the Workers' Compensation Act, a claimant must sustain injuries from an accident arising out of and in the course of his employment. (Ill. Rev. Stat. 1979, ch. 48, par. 138.2.) The term "accident" is not a technical legal term, and as it is used in the Act, it is a comprehensive term almost without boundaries as related to some untoward event. (*Peoria County Belwood Nursing Home v. Industrial Comm'n* (1985), 138 Ill. App. 3d 880, 487 N.E.2d 356, *aff'd* (1987), 115 Ill. 2d 524, 505 N.E.2d 1026.) An "accident" can be established by a claimant by the theory of repetitive trauma or by tracing a work-related injury to a specific accident which is identifiable as to time and place or as to a specific moment of collapse of a person's physical structure, identifiable to time and place. *Luckenbill v. Industrial Comm'n* (1987), 155 Ill. App. 3d 106, 507 N.E.2d 1185; *Butler Manufacturing Co. v. Industrial Comm'n* (1986), 140 Ill. App. 3d 729, 489 N.E.2d 374.

■ Whether claimant's injuries were a result of a work-related accident arising out of and in the course of his employment was a factual determination within the province of the Industrial Commission. This determination can be based upon direct or circumstantial evidence and the reasonable inferences that can be drawn from that evidence, and the inferences drawn by the Industrial Commission will not be set aside upon review merely because other inferences could be drawn. (*General Electric Co. v. Industrial Comm'n* (1984), 129 Ill. App. 3d 352, 472 N.E.2d 486; *Board of Education v. Industrial Comm'n* (1983), 96 Ill. 2d 239, 449 N.E.2d 839.) The Industrial Commission's determination that an accident arose out of and in the course of employment will not be overturned unless it is against the manifest weight of the evidence. *Elliot v. Industrial Comm'n* (1987), 153 Ill. App. 3d 238, 505 N.E.2d 1062.

■ In this case, the Industrial Commission found that claimant's current state of ill-being was the result of an accident. While there was a dearth of direct evidence to support this determination, the circumstantial evidence presented was sufficient. Claimant had been driving a forklift truck for approximately 5 hours and 15 minutes prior to the incident. Claimant either swerved to avoid hitting a pothole and hit something else or he hit the pothole, which caused him to fall or to be thrown from his truck. When claimant was found, he was lying unconscious upon the ground parallel to his truck, which was three feet away. There was testimony that there were numerous potholes in the area in which claimant was working and that there was a deep pothole to the left and to the rear of claimant's truck.

The medical records from Burnham City Hospital indicated that claimant had an abrasion on his forehead over his right eyebrow and that claimant had a head injury. Claimant's head injury was traceable to a specific time and a specific place. From this evidence, the Industrial Commission could have inferred that an untoward event had occurred causing claimant to hit his head. Thus, while the actual facts of the incident were unknown, the circumstantial evidence supported the Industrial Commission's determination that there was an accident.

Further, the medical evidence supported the determination that claimant's head injury, which he suffered during this accident, was the cause of claimant's current mental state. The totality of the medical evidence established that claimant's mental deterioration was the result of a trauma to the head. The testimony disclosed that prior to May 1, 1980, claimant was a mentally sound individual, but that after the accident, claimant's mental condition deteriorated. The only reasonable explanation for claimant's condition was that the accident caused his current state of ill-being. Therefore, the Industrial Commission's determination that claimant's ill-being was caused by a work-related accident and that it arose out of and in the course of his employment was not against the manifest weight of the evidence.

Respondent argues that there was conflicting evidence presented that claimant did not have an accident. Respondent states that the evidence that claimant's truck was turned off when claimant was found and that his hard hat was behind the seat gave rise to the inference that claimant had shut off his truck and that he had not hit a pothole. Again, it is the Industrial Commission's province to weigh conflicting evidence and to resolve the conflict. (*Chicago Rotoprint v. Industrial Comm'n* (1987), 157 Ill. App. 3d 996, 509 N.E.2d 1330.) The inference that claimant received his injury from a work-related accident was a reasonable inference from the evidence presented.

■ Even if claimant had not struck a pothole but instead fell as he got out of his forklift and struck his head during his fall, his condition would still be compensable. Respondent argues that since claimant had had a fall down the stairs over four months previously, it was this former back injury which caused him to fall on May 1, 1980, and therefore, his fall was idiopathic and noncompensable. Idiopathic falls result from an internal, personal origin and are not compensable in Illinois, while unexplained falls are compensable. *Elliot*, 153 Ill. App. 3d 238, 505 N.E.2d 1062; *Oldham v. Industrial Comm'n* (1985), 139 Ill. App. 3d 594, 487 N.E.2d 693; *Chicago Tribune Co. v. Industrial Comm'n* (1985), 136 Ill. App. 3d 260, 483 N.E.2d 327; *Sears, Roebuck & Co. v. Industrial Comm'n* (1979), 78 Ill. 2d 231, 399 N.E.2d 594.

■ The evidence in this case does not sustain respondent's argument that claimant's fall was idiopathic. The medical evidence demonstrated that claimant was released after his back injury to return to work on March 10, 1980. There was no evidence presented that claimant's back injury had created an organic weakness likely to cause him to fall or that he had injured his head when he sustained his back injury. Likewise, there was no evidence presented that claimant fell as a result of a seizure. If claimant's injury was caused by a fall as he alighted from his forklift truck, it can only be determined to be an unexplained fall and not an idiopathic one. A reviewing court can affirm the Industrial Commission's decision if there is any legal basis in the record to support its decision regardless of the Industrial Commission's findings or reasoning. (*Butler Manufacturing Co.*, 140 Ill. App. 3d 729, 489 N.E.2d 374.) Since claimant's award could be sustained on the theory that his ill-being was the result of an unexplained fall at work, thereby arising out of and in the course of his employment, the Industrial Commission's decision is not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Vermilion County, confirming the Industrial Commission's decision, is affirmed.

Judgment affirmed.

BARRY, P.J., and McNAMARA, WOODWARD, and McCULLOUGH, JJ., concur.