909 N.E.2d 983 (2009)
CIRCUIT CITY STORES, INC., Appellee,
v.
ILLINOIS WORKERS' COMPENSATION COMMISSION (Clinton DWYER, Appellant).
No. 2-08-0722 WC.
Appellate Court of Illinois, Second District.
July 9, 2009.
*984 Richard D. Hannigan, Hannigan & Botha, Ltd., Mundelein, IL, for Appellant.
Patrick W. Martin, Attorney At Law, Chicago, IL, for Appellee.

Modified Upon Denial of Rehearing
Justice HOLDRIDGE delivered the opinion of the court:
Clinton Dwyer filed an application for adjustment of claim against his employer, Circuit City Stores, Inc., seeking workers' compensation benefits for an injury to his right leg. The matter proceeded to an arbitration hearing, where the arbitrator found that Dwyer's injury was compensable under the Workers' Compensation Act (the Act) (820 ILCS 305/1 et seq. (West 2006)). Accordingly, the arbitrator issued the following awards: medical expenses totaling $60,306.83; temporary total disability benefits of $182.62 per week for 124/7 weeks (March 6 through June 1, 2005); and permanent partial disability benefits of $164.36 per week for 70 weeks (representing 35% loss of use of the right *985 leg). The arbitrator denied Dwyer's request for penalties and attorney fees.
Circuit City appealed to the Illinois Workers' Compensation Commission (Commission), which affirmed and adopted the arbitrator's decision, with one member dissenting. Circuit City then appealed to the McHenry County circuit court, which reversed the Commission's decision. According to the court, the Commission erred in finding that the "personal comfort doctrine" applied to the instant facts and that Dwyer's injury was compensable under the Act. Dwyer responded by filing the instant appeal. He claims: (1) the personal comfort doctrine applies to the instant facts, as found by the arbitrator and the Commission; (2) the doctrine should be extended, as a matter of law, to cover an employee who is injured while coming to the aid of a coworker seeking personal comfort; and (3) the Commission did not err in finding that his injuries arose out of and in the course of his employment. We reverse the circuit court's judgment and reinstate the Commission's decision.

BACKGROUND
A medical report from Doctor Walter Virkus dated June 11, 2003, reads: "Clint Dwyer is an 18-year-old male who approximately one week ago began having pain in the right groin. He relates this to being after he pitched a game of baseball. He has had no prior complaints of pain in this hip. The pain also seems to be activity related." X-rays showed a lesion in the right femoral neck with no evidence of acute fracture or stress fracture. A magnetic resonance imaging study showed a corresponding lesion with no evidence of stress fracture. Doctor Virkus attributed the lesion to a unicameral bone cyst that must have been present for a number of years but was "just now becoming symptomatic." He observed, "This may be related to the fact that the patient recently began his summer job in landscaping and basically spends all day pushing a lawnmower." Recognizing a possible need for curettage and grafting, Doctor Virkus prescribed a short trial of rest because the lesion had previously been asymptomatic. The trial period included two weeks on crutches, another four weeks with no baseball or landscaping work, and then resumption of regular activities.
During a follow-up visit on July 30, 2003, Dwyer reported feeling fine except for a recent episode of pain that resolved after one day. He had no pain at the time of the visit. Doctor Virkus's examination revealed full range of motion and no tenderness to stress with internal and external rotation. His report from the visit reads:
"If he [Dwyer] is asymptomatic I do not think this needs to be curettaged and grafted. I informed him that this could be done at any time if he decided he wanted to stop worrying about it. I stringently cautioned both him and his mother that if he were to ignore persistent symptoms of pain in the hip that he would likely have a stress fracture through the femoral neck, and this would be a potentially disastrous situation considering his age. He indicated to me that he had absolutely no interest in having surgery and that he would address his activities appropriately."
Dwyer testified that, per Doctor Virkus's permission, he resumed normal activities (including baseball and work) and performed those activities without returning for medical care until March 6, 2005the date of accident in the instant case.
At the time in question, Dwyer was employed by Circuit City installing car stereos and other equipment. He performed his duties in an installation bay, which was connected to an employee break room by a hallway. The hallway contained a snack vending machine and a soda machine. There were also four rooms off the *986 hallway: two management offices, a men's washroom, and a women's washroom. The washrooms were open to the public. Dwyer testified that the snack vending machine was fairly large with a glass front and metal sides. He used the machine two or three times per week and had experienced some problems with products getting stuck. When a product got stuck, he either shook the machine to dislodge it or simply purchased it again. He had occasionally seen other employees shake the machine as well, but he could not recall their names. To the best of Dwyer's knowledge, no employee was reprimanded for shaking the machine. No rules were posted near the machine explaining a protocol if a product got stuck; nor did Circuit City have any written forms or policies covering this situation. If an employee simply lost money in the machine, however, the store had a protocol for the employee to submit a form to management. Dwyer had never lost money in the machine.
Regarding his accident, Dwyer testified that on March 6, 2005, he was working in the installation bay when a coworker named Jessica Hubner asked him for help dislodging a bag of chips she had purchased from the vending machine. Dwyer went with Hubner to the hallway and saw the bag stuck in the machine. He shook the machine from the front, but to no avail. He then shook it from the side, again to no avail. As to what happened next, the transcript of his testimony reads:
"Q. Can you stand up and show Would you stand up and show the Arbitrator, please, what you did next * * *.
* * *
A. I was facing the side of the machine this way and I pretty much stood right here and I took one step forward and I hit the machine with my shoulder and it did not move and my hip followed and I pretty much fell to the ground. (Indicating.)
THE ARBITRATOR: Let the record reflect that the petitioner is indicating basically that he was assuming what I would call a fencing or even a self-defense posture with his right arm at mid chest level and indicating he stepped towards and apparently made contact with the machine. And I infer that he made contact with his shoulder and I infer that his hip moved forward, but I couldn't make any other inferences as to what happened with the hip that he referenced."
The matter was revisited on cross-examination as follows:
"Q. * * * So you only shook it once from the front and then you shook it again from the side and then you hit it with your shoulder?
A. Yes.
Q. * * * How many steps did you take before you struck the machine with your shoulder?
A. Like half a step. It wasn't even a full step."
Counsel for Circuit City then read the following statement from a medical report: "This morning he was trying to bang some snacks out of a machine with his shoulder and struck his hip on the machine." Dwyer agreed that the statement accurately described what happened. The following colloquy shortly ensued:
"Q. Clint, this accident occurred when you were attempting to forcefully remove potato chips from the machine, correct?
A. Yes.
* * *
Q. Would it be accurate to state that you took a running start towards the machine?

*987 A. No.
Q. You took one step?
A. Yes."
Dwyer testified that, upon falling to the floor, he felt "a very high level of pain" in his right hip unlike any he had felt before. Hubner promptly notified the store manager, whereupon an ambulance was called and Dwyer was taken to Centegra Northern Illinois Medical Center. X-rays revealed an impacted, slightly displaced fracture through the right femoral neck. Dwyer was then sent to Rush University Medical Center for immediate treatment by Doctor Virkus, who performed surgery that day (March 6, 2005).
The operative report states: "The patient is a 21-year-old man, who had a know[n] cyst in the femoral neck. He suffered an impact to the hip and suffered immediate fracture. * * * X-rays revealed a displaced fracture of the femoral neck through the cyst. * * * Please note that this procedure was done urgently due to the patient's young age and the displaced femoral neck fracture." The procedure involved open reduction and internal fixation of the right femoral neck with curettage of the cyst and bone grafting. Dwyer remained in the hospital through March 9, 2005, when he was discharged on crutches with a leg brace and prescriptions for medication.
Doctor Virkus administered follow-up care and kept Dwyer off work until May 10, 2005, when he allowed resumption of work with crutches, a 10-pound lifting restriction, and frequent rest. Circuit City did not provide work within these restrictions, and Dwyer consequently returned to Doctor Virkus's clinic requesting a full-duty release. A physician at the clinic obliged, and Dwyer resumed his regular job on June 2, 2005. He next returned to Doctor Virkus on April 6, 2006, and was advised that he did not need additional care.
Regarding his physical condition at the time of arbitration, Dwyer testified that he experienced problems with his right hip after sitting on a hard surface or crouching for a couple of hours. He could not cross his right leg to sit cross-legged. Weather changes and high humidity caused discomfort, and he experienced numbness and pain in the area of his surgical scar. Prior to the injury of March 6, 2005, he played baseball and jogged about a mile for exercise without incident. By comparison, he tried to run a half mile shortly before the arbitration hearing and felt pain in his right hip the following day.
Pursuant to subpoena by Circuit City, Jessica Hubner testified that she and Dwyer were both working in the store on March 6, 2005. Like Dwyer, Hubner worked as an installer of "stereo systems, remote starts, things like that." Shortly after beginning her shift, she put money into the vending machine and purchased a bag of Fritos, but the bag got stuck and did not fall. She unsuccessfully tried to dislodge the bag by shaking the machine and then asked Dwyer for help because he was the nearest coworker. Regarding Dwyer's actions toward the machine, the following colloquy occurred on direct examination:
"Q. Prior to hitting it from the side, did he strike it at all?
A. I think so. I'm not positive. I don't remember exactly. He may have hit it once or twice with his hand, but it didn't come out.
Q. Describe what happened when he hit it from the side.
A. He took a few steps back and * * * kind of jumped a little bit into the machine with his side to try and shake it loose. And that is when it came loose.

*988 * * *
Q. You said he took a few steps back. Do you recall specifically how many steps back he took?
A. Two or three, maybe.
Q. Did he run towards the machine or walk?
A. I would say he just walked. He didn'tThere wasn't enough room in between him and the machine that he would have ran at it. He just kind of leaped into it to try and give it a good nudge.
Q. He left his feet?
A. Yes."
When asked on cross-examination how she knew to shake the machine before seeking Dwyer's assistance, Hubner replied: "Logically, in my mind, something was stuck right there, so I shook it a little bit to try to shake it loose." She agreed that shaking the machine was a "first logical reaction to get the product." No one at Circuit City ever told her not to shake or bump the machine if a product got stuck, and no one ever told her what should be done in that situation. Hubner testified that the machine was for store employees. At the time in question, neither the money in the machine nor the Fritos belonged to Dwyer; "his involvement was simply to assist a co-employee." The accident occurred during his work hours.
Jennifer Ritter, Circuit City store director, testified that on March 6, 2005, Jessica Hubner approached her on the sales floor advising that Dwyer was hurt and needed an ambulance. Based on subsequent discussions with Hubner and Dwyer about the incident, Ritter described Dwyer's manner of attempting to remove the chips as "improper." Ritter acknowledged instances where customers had purchased bags of chips that got stuck in the machine. When asked if the store had a protocol for such instances, she replied: "Yes. I would give them the money to get another bag of chips out." She said the same protocol was conveyed to employees "with respect to what happened when money got stuck." As to products getting stuck, however, no employee had ever brought such an instance to her attention. Neither had she seen any employee shake or strike the machine, reprimanded any employee for doing so, or even heard of an employee doing so.
Ritter acknowledged on cross-examination that, if individuals had been able to dislodge products by shaking the machine, she would not have been contacted about the problem (meaning there would be no reason for her to know the practice was occurring). The store had no policy prohibiting employees from shaking the machine to dislodge products. Ritter said the machine was for customers and "the convenience and comfort of employees." However, since Dwyer was not on break at the time in question, Ritter said he violated company protocol by going to the machine. Ritter acknowledged that, despite being responsible for enforcing company protocol, she did not discipline Dwyer for the violation.
After proofs were closed, the arbitrator issued a written decision outlining certain facts and then stating:
"The true issue is whether the `personal comfort doctrine' applies to the facts of this case. * * *
* * *
In the case before this Arbitrator, the facts do not squarely fit within the `personal comfort doctrine' because the Petitioner [Dwyer] was not seeking refreshment for his own personal comfort but that of a co-employee. Further, the Petitioner was not on break. There was no testimony that employees were prohibited from assisting co-employees in *989 helping them for their own personal comfort. Also, while Ms. Ritter testified that the Petitioner violated an unstated policy in that he was not to jostle product out of the vending machine, she was aware that there was a problem with the vending machine in that she admitted that customers had product hang up in the machine. No formal work rule violation was underscored by the witness.
When making findings of fact, common sense and life experience are part of the decision making process. It is not unusual or outrageous that an individual, while looking at a product teetering o[n] the edge of a spindle, would * * * shake or jostle the machine in order to procure what they set out to buy. In this case at bar, it was proved that the co-employee, Jessica Hubner, shook the vending machine prior to asking the Petitioner for help. It was proved that the Respondent [Circuit City] had notice that there was a problem with the vending machine in that other people had their product hang up in the machine. It was proved that the machine was there for the personal comfort and convenience of the employees of this Respondent. It is the finding of the Arbitrator that the action of the Petitioner was not so outrageous or unusual in that people, who encounter vending machines that hang up the desired product, jostle the machine to get the product.
The Arbitrator adopts the above findings of material facts in support of his conclusion of law as follows: Based upon long standing Illinois Appellate Court case law the Arbitrator concludes as a matter of law and fact that the Petitioner's injuries of March 6, 2005 `arose out of' and `in the course of' his employment."
Accordingly, the arbitrator found a compensable accident. The Commission affirmed the arbitrator's decision, with one member dissenting. The dissenting commissioner argued that the personal comfort doctrine did not apply because: (1) Dwyer was not on break and not seeking his own comfort; and (2) even assuming, arguendo, that the doctrine covers third parties, Dwyer's actions were unreasonable and unforeseeable. Circuit City appealed to the McHenry County circuit court, which agreed with the dissenting commissioner's points and thus reversed the Commission's decision. Dwyer then filed the instant appeal.

DISCUSSION
An accidental injury is compensable under the Act only if it arises out of and in the course of the claimant's employment. Orsini v. Industrial Comm'n, 117 Ill.2d 38, 44-45, 109 Ill.Dec. 166, 509 N.E.2d 1005 (1987) (noting that, since the elements are conjunctive, both must be present at the time of injury); see 820 ILCS 305/2 (West 2006). The "arising out of" requirement pertains to the origin and cause of the injury. Orsini, 117 Ill.2d at 45, 109 Ill.Dec. 166, 509 N.E.2d 1005. "For an injury to `arise out of' the employment its origin must be in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." Caterpillar Tractor Co. v. Industrial Comm'n, 129 Ill.2d 52, 58, 133 Ill.Dec. 454, 541 N.E.2d 665 (1989). The "in the course of" requirement speaks to the time, place, and circumstances of the injury. Orsini, 117 Ill.2d at 44, 109 Ill. Dec. 166, 509 N.E.2d 1005. "An injury is received in the course of employment where it occurs within a period of employment, at a place where the worker may reasonably be in the performance of his duties, and while he is fulfilling those duties or engaged in something incidental thereto." Scheffler Greenhouses, Inc. v. Industrial Comm'n, 66 Ill.2d 361, 367, 5 Ill.Dec. 854, 362 N.E.2d 325 (1977).
*990 Professor Larson's treatise on workers' compensation law articulates the personal comfort doctrine as follows:
"Employees who, within the time and space limits of their employment, engage in acts which minister to personal comfort do not thereby leave the course of employment, unless the * * * method chosen is so unusual and unreasonable that the conduct cannot be considered an incident of the employment." 2 A. Larson & L. Larson, Workers' Compensation Law § 21, at 21-1 (2008).
The Illinois Supreme Court has adopted this doctrine. See, e.g., Hunter Packing Co. v. Industrial Comm'n, 1 Ill.2d 99, 104, 115 N.E.2d 236 (1953) ("an employee, while engaged in the work of his employer, may do those things which are necessary to his health and comfort, even though they are personal to himself, and such acts will be considered incidental to the employment"); Chicago Extruded Metals v. Industrial Comm'n, 77 Ill.2d 81, 84, 32 Ill.Dec. 339, 395 N.E.2d 569 (1979) ("injuries sustained by an employee while in the performance of reasonably necessary acts of personal comfort may be found to have occurred `in the course of' his employment, since they are incidental to the employment"); Eagle Discount Supermarket v. Industrial Comm'n, 82 Ill.2d 331, 339-40, 45 Ill.Dec. 141, 412 N.E.2d 492 (1980) ("the course of employment is not considered broken by certain acts relating to the personal comfort of the employee," but, "if the employee voluntarily and in an unexpected manner exposes himself to a risk outside any reasonable exercise of his duties, the resultant injury will not be deemed to have occurred within the course of the employment").
As these authorities suggest, the personal comfort doctrine does not answer the whole question of compensability because it addresses only the "in the course of" requirement; the "arising out of" requirement must be met independently. See also Union Starch, Division of Miles Laboratories, Inc. v. Industrial Comm'n, 56 Ill.2d 272, 277, 307 N.E.2d 118 (1974) (describing a personal comfort issue as "[t]he more difficult question" after finding sufficient evidence to support an "arising out of" determination). Along these lines, we have observed that application of the personal comfort doctrine "would only establish that [the] claimant is considered to be in the course of his employment" and thus would not obviate an "arising out of" analysis. Karastamatis v. Industrial Comm'n, 306 Ill.App.3d 206, 211, 238 Ill. Dec. 915, 713 N.E.2d 161 (1999).
In the instant case, the Commission found that Dwyer's injury arose out of and in the course of his employment. We will not reverse the Commission's decision unless it is contrary to law or its factual determinations are against the manifest weight of the evidence. Durand v. Industrial Comm'n, 224 Ill.2d 53, 64, 308 Ill.Dec. 715, 862 N.E.2d 918 (2006). A factual determination is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent (meaning no rational trier of fact could have agreed with the Commission). Durand, 224 Ill.2d at 64, 308 Ill.Dec. 715, 862 N.E.2d 918.
The Commission's finding that Dwyer's injury arose out of his employment is not contrary to law. Regarding the manifest weight of the evidence, there is no question that Circuit City provided the vending machine for use by its employees. Jessica Hubner testified that the machine was for employees, while Jennifer Ritter testified that it was for customers and "the convenience and comfort of employees." There is also no question that the machine had a defect. All three witnesses described separate instances where products got stuck instead of being dispensed *991 upon purchase. This defect precipitated Dwyer's injury by creating a need for action to dislodge the bag of Fritos. Under these circumstances, a rational trier of fact could have found that the injury originated in a risk incidental to his employment-thus creating the requisite causal connection. Accordingly, the Commission's finding on this matter is not against the manifest weight of the evidence.
As for the "in the course of" requirement, the Commission found that Dwyer's injury qualified under the personal comfort doctrine. That finding is contrary to law. By its own terms, the personal comfort doctrine applies to employees who sustain injuries while seeking their own personal comfort (Jessica Hubner in the instant case, not Dwyer). The doctrine has never been applied, and does not apply, to injuries sustained by an employee while assisting a coworker who is seeking personal comfort. We need not belabor this point because a separate doctrine, the so-called "good Samaritan doctrine," is applicable instead.
In Ace Pest Control, Inc. v. Industrial Comm'n, 32 Ill.2d 386, 205 N.E.2d 453 (1965), the employee, Raymond Burns, was driving to Peoria from a service call in Bloomington when he noticed a vehicle parked beside the highway. It was near dusk and the temperature was below freezing. Burns stopped his work truck to offer assistance and discovered Mrs. Richard Kuntz and her four young children inside the vehicle. Kuntz had run out of gas. When Burns offered to take her to the nearest service station, she said her farmhouse was actually closer. Burns thus drove Mrs. Kuntz and the children home, a distance of about two miles, whereupon Mr. Kuntz obtained a can of gasoline and rode back to the stranded vehicle with Burns in the work truck. Burns exited the truck beside the highway and, while walking around to remove the can of gasoline, was struck and killed by a passing vehicle.
The evidence showed that Burns's employer had no definite policy on stopping to help stranded motorists, leaving the decision to each employee. The company's president testified that he had stopped to render assistance on prior occasions and that the work truck was like a mobile billboard because it bore the company's name.
Observing that Burns was not acting under express instructions from his employer, and was not under any legal duty to stop and render aid, the Illinois Supreme Court explained: "The issue thus narrows to whether the giving of such aid could have been reasonably expected or foreseen." Ace Pest Control, 32 Ill.2d at 388, 205 N.E.2d 453. The court answered this question in the affirmative, specifically rejecting the employer's claim that Burns's assistance involved too much deviation from his regular duties to be foreseeable. See also Metropolitan Water Reclamation District of Greater Chicago v. Industrial Comm'n, 272 Ill.App.3d 732, 208 Ill.Dec. 977, 650 N.E.2d 671 (1995) (when a lock master on the Chicago River was injured while attempting to rescue someone who fell into Lake Michigan, his actions were not outside the scope of his employment); Johnson v. Industrial Comm'n, 278 Ill. App.3d 59, 214 Ill.Dec. 802, 662 N.E.2d 156 (1996) (when an administrative assistant was injured on a Mexican yacht cruise while trying to protect her boss's niece from roughhousing by her boss's sons, the protective action was reasonable and foreseeable, thus falling within the scope of her employment).
In discussing Ace Pest Control, we have observed that Burns's fatal injury was compensable because his "`good samaritan' act was deemed foreseeable." Metropolitan *992 Water Reclamation District of Greater Chicago, 272 Ill.App.3d at 737, 208 Ill.Dec. 977, 650 N.E.2d 671. Accordingly, when an employee leaves his or her work duties to render aid to a third party, the "in the course of" determination hinges on whether the employee's departure was reasonably foreseeable. In the instant case, the Commission found that Dwyer's conduct while coming to Hubner's aid was reasonably foreseeable. This factual finding is germane to the good Samaritan doctrine[1] and not against the manifest weight of the evidence.
In each of the above-cited cases, the cause for rendering aid was admittedly more urgent than in the instant case. However, none of those cases involved a request for assistance by a coworker, let alone a coworker stationed in the claimant's own department. What the instant case lacks in urgency (urgency being just one possible indicator of foreseeability), it makes up for in collegiality. There is no question that the vending machine was provided for the use and comfort of Circuit City's employees and that products were known to get stuck in the machine. Ritter's testimony established such knowledge at the management level. Moreover, the record contains evidence that employees shook the machine to dislodge products. Dwyer testified to occasions where he and other employees had done so. Even Hubner personally shook the machine before seeking help from Dwyer. When questioned in this regard, she testified: "Logically, in my mind, something was stuck right there, so I shook it a little bit to try to shake it loose." She agreed that shaking the machine was a "first logical reaction to get the product."
In light of this evidence, it was reasonably foreseeable that an employee might ask a coworker for assistance to dislodge a product from the machine. It was also reasonably foreseeable that the coworker would come to the aid of a fellow employee.[2] The remaining question, then, is whether Dwyer's manner of rendering aid crossed the line of foreseeability and thus took him outside the scope of his employment.
Dwyer testified that he went with Hubner to the hallway and saw her bag of Fritos stuck in the vending machine. He shook the machine from the front, but to no avail. He then shook it from the side, again to no avail. As to what happened next, he said: "I was facing the side of the *993 machine * * * and I took one step forward and I hit the machine with my shoulder and it did not move and my hip followed and I pretty much fell to the ground." The arbitrator then commented:
"Let the record reflect that the petitioner is indicating basically that he was assuming what I would call a fencing or even a self-defense posture with his right arm at mid chest level and indicating he stepped towards and apparently made contact with the machine. And I infer that he made contact with his shoulder and I infer that his hip moved forward, but I couldn't make any other inferences as to what happened with the hip that he referenced."
When asked how many steps he took toward the machine before striking it with his shoulder, he responded: "Like half a step. It wasn't even a full step." When asked if he took a running start, he said, "No."
During Hubner's testimony, the following colloquy occurred on direct examination by counsel for Circuit City:
"Q. Describe what happened when he hit it from the side.
A. He took a few steps back and * * * kind of jumped a little bit into the machine with his side to try and shake it loose. And that is when it came loose.
* * *
Q. You said he took a few steps back. Do you recall specifically how many steps back he took?
A. Two or three, maybe.
Q. Did he run towards the machine or walk?
A. I would say he just walked. He didn'tThere wasn't enough room in between him and the machine that he would have ran at it. He just kind of leaped into it to try and give it a good nudge.
Q. He left his feet?
A. Yes."
It is reasonably foreseeable that, after unsuccessfully shaking the machine to dislodge a product, an employee might resort to butting the machine with his or her shoulder. According to Dwyer's testimony, he did nothing more. Hubner's testimony, which adds detail, is amenable to a construction consistent with Dwyer's description of the event. For instance, she said he "kind of" jumped or leaped into the machine "a little" just to "give it a good nudge." Even though he "maybe" took two or three steps back, Hubner unequivocally testified that he did not run at the machine but "just walked." Under these circumstances, the Commission could have reasonably found that Dwyer's manner of assisting Hubner did not cross the line of foreseeability so as to take him outside the scope of his employment. Accordingly, the Commission's decision is not against the manifest weight of the evidence.

CONCLUSION
For the foregoing reasons, we reverse the judgment of the McHenry County circuit court and reinstate the Commission's decision.
Circuit court judgment reversed; Commission decision reinstated.
McCULLOUGH, P.J., and HOFFMAN, HUDSON, and DONOVAN, JJ., concurring.
NOTES
[1] Although the Commission decided the case on other grounds, we can uphold its decision on any legal basis supported by the record. See General Motors Corp., Central Foundry Division v. Industrial Comm'n, 179 Ill.App.3d 683, 695, 128 Ill.Dec. 547, 534 N.E.2d 992 (1989).
[2] These observations, and the principles of law behind them, illustrate how Circuit City misses the mark in arguing the absence of imminent danger or exigent circumstances. The linchpin of the "in the course of" requirement in this context is foreseeability, not emergency. Circuit City's argument replaces the end with a means.

In a similar vein, Circuit City cites Professor Larson's treatise for the proposition that when an employee renders aid to a co-employee, "[i]f the aid takes the form of merely helping the co-employee with some matter entirely personal to the co-employee, it is outside the course of employment, unless the deviation involved is insubstantial." 2 A. Larson & L. Larson, Workers' Compensation Law § 27, at 27-7 (2008). Immediately following this passage in the treatise, Professor Larson lists several cases where compensation was denied. The factual difference between the instant case and those cases is telling. In all but one (Bivens v. Marshall R. Young Drilling Co., 251 Miss. 261, 169 So.2d 446 (1964)), the employee was not even injured during work hours. In Bivens, moreover, the employee left his employer's premises at work time to participate in a squirrel hunting expedition with two other employees who were off work, injuring himself in the process. The instant facts fall on the insubstantial, foreseeable side of the line.